**SOUTHWESTERN INVESTMENT COMPANY, Petitioner,**

v.

**Juan ALVAREZ, Respondent.**

**No. B–1699.**

Supreme Court of Texas.

April 15, 1970.

Rehearing Denied May 13, 1970.

Clayton & Clayton, Cleo G. Clayton, Jr., Amarillo, for petitioner.

Sam J. Dwyer, Jr., El Paso, for respondent.

POPE, Justice.

Juan Alvarez filed suit against Southwestern Investment Company, hereafter called S. I. C., for the conversion of his 1962 Ford. The trial court rendered judgment on a verdict in favor of Alvarez for $1,500.00 actual damages and $5,000.00 exemplary damages. The court of civil appeals affirmed the judgment upon condition that Alvarez file a remittitur in the sum of $2,500.00 exemplary damages. 442 S.W.2d 862. We modify the judgments of the courts below and affirm the judgment for Alvarez in the sum of $1,500.00 actual damages.

S. I. C. is before this court with a number of points which essentially urge that (1) there is no evidence of a conversion, (2) the judgment for actual damages should have been reduced by the amount Alvarez owed on the vehicle, and (3) there is no evidence of malice which supports the finding of exemplary damages.

 There is some evidence of a conversion. In December, 1961, Alvarez bought his automobile from El Paso Auto Center, Inc. He made a down payment of $1,000.00 and financed the balance of $3,530.16 by his execution of a note and mortgage. He agreed to pay thirty-six monthly payments of $98.06 on the twentieth day of each month beginning in January of 1962. S. I. C. purchased the note and mortgage, but it had an agreement with Auto Center which obligated Auto Center to buy back from S. I. C. any vehicles which Auto Center had sold and which S. I. C. later repossessed. The agreement was that Auto Center would pay S. I. C. in cash the amount of any unpaid balance which was owing on the cars.

Alvarez made all of his payments up to February 1964, but he was consistently late in paying the installments. He fell behind on his payments for February 20 and March 20, 1964, and on March 27 he permitted S. I. C. to pick up the automobile. He testified that S. I. C. agreed to hold the car until he made the payments. S. I. C. picked up the car on March 28 and its ledger sheet was stamped, "Repossessed—Date 3–31–64." A few days later Alvarez went to the office

of S. I. C. to pay the two installments and was told to check with Auto Center. On checking there, Alvarez learned that Auto Center had sold the automobile on April 7 to another person for $1,951.75. The proof shows that Auto Center, in compliance with its dealer's protection agreement, paid to S. I. C. the full amount which Alvarez still owed on his note, which was the sum of $1,239.89.

S. I. C. says there was no conversion because it did not make an agreement with Alvarez to extend the time for him to make his two payments. The jury made a finding that S. I. C. "agreed to hold the 1962 Ford * * * until after March 31, 1964, to permit plaintiff to pay the payments for February, 1964 and March, 1964." S. I. C. urges that there is no evidence of such an agreement. Our examination of the direct and cross-examination of Alvarez shows that he was not an articulate person, and often his answers were not entirely responsive to the questions. He did, however, in his disjointed testimonial style tell the jury his story. He testified that he was at first only one month behind. This related to his February payment. He next said, without another question, "I got behind two months. I stopped at the office and talked to the * * * man in charge of this kind of * * * I don't know whether it is adjustments or something; I need more days to * * * to make the two payments. He said, 'Well, we take the station wagon until you pay the two payments.'" The time of this conversation can be fixed since Alvarez said it was the day before S. I. C. picked up the car which was on March 28. Alvarez' attorney later asked him, " * * * explain to the jury about that part of it, what agreement you reached with them about making up the two payments?" To this, Alvarez responded:

> "Well, I don't have any * * * you know, any paper or any note or nothing, only talked to the man in charge of this office, and he say he take the station wagon, after you pay the two months * * * because I stop at the office be-

fore the two months late, a few days before, I just stop and I talk * * * to wait for the payment of next week because I work right now and he says, 'yes, okay, the only trouble is I need to bring the station wagon here to the office,' and I accept to this."

Alvarez testified that he agreed to pay late charges for the extension of time. R. F. Finance Corporation v. Jones, 50 S.W.2d 475 (Tex.Civ.App.1932, no writ).

The jury could well have concluded from this direct evidence that an agreement was made the day before the car was picked up and that the automobile would be held by S. I. C. until Alvarez paid the two delinquent payments the following week. We conclude that there was some direct and inferential evidence which supports the jury finding that there was an agreement to extend the time for payment.

■ S. I. C. also says that the trial court rendered judgment for damages in an erroneous amount. It says Alvarez owed S. I. C. at the time of the conversion the sum of $1,239.89 and that amount should have been setoff against the amount the jury found as the value of the car. Alvarez alleged two different measures of recovery in his petition and a trial amendment. He first alleged that the vehicle had a reasonable market value of $2,500.00, in which amount he was damaged. By a trial amendment he asserted, not in lieu of his allegation of damages in the sum of $2,-500.00 but by way of a "further" pleading, that he was entitled to recover the difference between $1,951.00, the amount for which the car was sold, and the sum of $1,239.89, the amount he owed on the car at the time of the alleged conversion. We construe Alvarez' pleading as one which asserts alternative measures of recovery. S. I. C. filed no exceptions to the pleadings and asserted no offset. The absence of any pleading by S. I. C. for an offset is the basis for the trial court's judgment that Alvarez should recover the value of the vehicle as found by the jury.

S. I. C. says that Alvarez failed to prove that it acted with malice and that such proof is essential to a judgment for punitive damages. We sustain this contention. Alvarez tried his case and the issues were submitted upon the theory that his proof of an unlawful or wrongful act was sufficient to support a recovery of exemplary damages. In Ware v. Paxton, 359 S.W.2d 897 (Tex.Sup.1962), we wrote:

> "The fact that an act is unlawful is not of itself ground for an award of exemplary or punitive damages. The act complained of not only must be unlawful but also must partake of a wanton and malicious nature, or, as sometimes stated, somewhat of a criminal or wanton nature, and an act will not be deemed malicious, and so warranting punitive damages, merely because it is unlawful or wrongful."

We hold that Alvarez failed to prove any malice and that this failure defeated his claim to exemplary damages.

The judgment that Alvarez recover damages is reformed by the elimination of all exemplary damages and, as thus reformed, is affirmed.

STEAKLEY, Justice (dissenting).

I respectfully dissent in the view that the jury findings upon which the award to Alvarez must rest are without support in the evidence. I would hold that the recovery of Alvarez is limited to the value of his equity in the repossessed automobile.

Problems of "no evidence" are often difficult of solution. Admittedly, we have the power to say, as the majority has here, that there is "some evidence" to support essential findings. But in doing so we should steadfastly adhere to reliable and acceptable standards by which evidence is weighed. I do not think the majority has done so here. The reasons for my views can best be shown by a more detailed analysis of the evidence, including the testimonial words of Alvarez in fuller context.

Alvarez purchased a 1962 Ford station wagon from El Paso Auto Center, Inc., in December, 1961. He financed the purchase by executing a note and chattel mortgage in favor of Auto Center which evidenced a down payment of $1,000.00 and a financed balance of $3,530.16. The balance was to be paid in thirty-six equal monthly installments of $98.06 due and payable on the twentieth day of each month beginning in January of 1962. The mortgage authorized repossession of the automobile and foreclosure of the mortgage upon default. SIC purchased the Alvarez note and mortgage from Auto Center. Alvarez was late from two to twenty-five days on each subsequent monthly payment to SIC and on occasions paid charges for late payments. The present controversy followed a visit by Alvarez to the offices of SIC in El Paso. He testified as follows under interrogation by his Counsel:

Q (BY MR. DWYER:) "Now, sir, I will ask you if *sometime in February, 1964,** if you became behind in your payments with the SIC Company?

A "Yes

Q "Will you tell the jury here what occurred, if anything, *at that time* in regard to payments?

A "Well, at this time I don't have a job and *I was one month behind and a few days more*; I got behind two months. I stopped at the office and talked to the—I don't know the man in charge of this kind of—I don't know whether it is adjustments or something; I need more days to—to make the two payments. .

"He says, 'Well, we take the station wagon until you pay the two payments.'

"I agree with him to give—I told—I said 'Okay, only my station wagon

---

* Italics are those of the writer in each instance.

is at my home; I don't have the keys here.' And the next day some—this —this man working for this company stopped at my home; he come to my home, my wife is at my home, my wife gave him the keys for this man, and I wait there for next week to get payment, this time I was working now, and I just stop at the office to make a payment Friday, a little late, and this—it is time to close and the man working in this department is busy and I stopped in the front, I tried to pay—to make payments and the lady working in the front, she said two payments; she said two payments and I needed to talk to the man, you know, in charge of this office, and I don't have a chance to talk, I don't know what is the name, I don't remember the name. I wait for this next day, Saturday, and I stopped in the office and he is not in the office at that time. I stopped on Saturday. I need to wait next whole week because I work too far and I don't have opportunity to stop in the office and make payments because it is closed by the time I come, and next Friday, I had—next Saturday, I had opportunity to talk to the man in charge of this office and he say 'Well, the station wagon is not here; you like to go to El Paso Ford and take the station wagon; you will recognize the car.'

 \* \* \* \* \* \*

Q "Yes. Now, explain to the jury here about this matter of the agreement you made, if any, when you got— you were a payment behind and I believe you testified—explain to the jury about that part of it, what agreement you reached with them about making up the two payments?

A "Well, I don't have any—you know, any paper or any note or nothing, only talked to the man in charge of this office, and he say he take the station wagon, after you pay the two months—*because I stop at the office before the two months late, a few days before*, I just stop and I talk—to wait for the payment of next week because I work right now and he says 'yes, okay, the only trouble is I need to bring the station wagon here to the office,' and I accept to this.

Q "Did you agree to pay any late charges?

A "Yes, I accept the late charge.

 \* \* \* \* \* \*

Q "Continue.

A "When I talk to this man, he says yes, I would have to pay charges because after ten days, you have to pay charges. That is okay, I pay that two months, or pay late,—not enough. I only talked to this man working in the office, you know. I agree to pay the charge for the pay late."

An employee of SIC testified that Alvarez contacted him at the office of SIC on March 6, 1964, and stated that he would make two payments on March 20; that he failed to do so and SIC mailed him a late notice; that Alvarez came to the office on March 23 and said he would pay on Friday, March 27, which was agreeable with him; that Alvarez returned on March 27 and stated he was unable to make the past due payments and authorized SIC to pick up the automobile on the following day, March 28. It was further shown that the ledger sheet of Alvarez in the offices of SIC was stamped "Repossessed—Date 3–31–64".

The pertinent jury findings were that SIC "agreed to hold the 1962 Ford \* \* \* until after March 31, 1964, to permit plaintiff to pay the payments for February, 1964, and March, 1964" (No. 1); that SIC "on or about March 31, 1964, did take and convert to its own use the plaintiff's 1962 Ford in question" (No. 4); that "the reasonable market value \* \* \* of said 1962 Ford

in question, on or about March 31, 1964, at its location in El Paso County, Texas" was "$1,500.00" (No. 7); that Alvarez was "entitled to exemplary damages against the defendant" in the sum of "$5,000.00" (Nos. 8 and 9).

It is the rule that the agreement of a mortgagee to hold mortgaged property until a date certain within which delinquent payments may be made, and of the mortgagor to pay an additional charge for late payment, is supported by consideration and is enforceable; in such case, there is a breach of the agreement and a conversion if the mortgagee sells the property within the grace period. Commercial Credit Corporation v. Flores, 345 S.W.2d 432 (Tex.Civ. App.1961 writ ref., n. r. e.); Woodard v. Tatum, 277 S.W.2d 943 (Tex.Civ.App.1955, no writ). A mortgagor establishing a cause of action against his mortgagee for conversion is entitled to recover the value of his equity in the property at the time. Commercial Credit Corporation v. Flores, supra. But here there is no satisfactory support in the evidence for the finding of the jury that SIC "agreed to hold the 1962 Ford in question, until after March 31, 1964, to permit plaintiff to pay the payments for February, 1964, and March, 1964"; and hence no support for the further finding of the jury that SIC "on or about March 31, 1964, did take and convert to its own use the plaintiff's 1962 Ford in question." The testimony of Alvarez which can be said to bear upon this problem is his vague and ambiguous statement that on some unidentified occasion "[h]e [referring to an unidentified 'man in charge' at the office of SIC] says, 'Well, we take the station wagon until you pay the two payments.'" Alvarez was here answering questions propounded by his counsel phrased in terms of "what occurred" at that time "in February, 1964," at which time he was one payment—the February 20 payment—in arrears. The two payments referred to by the person Alvarez was purporting to quote would necessarily be those of February 20—which was past due—and of March 20—which was to become due on that date. This is further indicated by the testimony of the employee of SIC that Alvarez contacted him on March 6 and stated that he would make two payments on March 20. On the occasion of this first visit, either in February as indicated by the testimony of Alvarez or on March 6 as indicated by the testimony of the SIC employee, Alvarez was in arrears in one payment and SIC could have exercised its right of repossession. It is not reasonable to suppose that at such time and under such circumstances SIC would have agreed to indefinitely hold the automobile beyond March 31. The most that can be reasonably inferred from the evidence is that SIC agreed to forbear upon the promise of Alvarez to make the two payments on March 20 and pay late charges, while at the same time warning Alvarez that the right of repossession would be asserted if he failed to make the promised two payments. Further forbearance of SIC is shown in the fact that it did not repossess the automobile upon the failure of Alvarez to make the two payments on March 20, but instead sent him a late notice and appeared to accept his further promise on March 23 that he would make the two payments on March 27. The testimony of the employee of SIC that Alvarez authorized repossession of the automobile on the following day, March 28, finds no dispute in the testimony of Alvarez or elsewhere in the record. It is quite clear to me that there is no evidence in the correct sense of this term in our appellate review that anyone acting for SIC agreed to hold the mortgaged automobile after it came into its possession, and until after March 31, for the purpose of permitting Alvarez to meet the past due February and March, 1964, payments. If so, there was no conversion when the automobile was tendered into the possession of SIC on March 28, or when, on March 31, it exercised the contract right to declare the automobile repossessed.

Alvarez filed a trial amendment alleging the following:

"Plaintiff does hereby further allege that at the time that the vehicle in question

was sold to Ezequiel Rodriguez in the amount of $1951.00, Plaintiff had a pay-off balance with SIC in the amount of $1239.89 and that therefore Plaintiff is entitled to the difference between what he owed, to-wit: $1239.89 and $1951.00."

I construe this as a plea for the value of the equity of Alvarez, i. e. the difference between the reasonable market value of the automobile and the amount of his admitted current indebtedness. The jury found the value of the automobile to be $1500.00, which when reduced by the judicially admitted debt of $1,239.89, established the equity of Alvarez to be $260.11. I would award him this sum.

There is one other matter upon which I wish to reserve judgment. It is stated in Commercial Credit Corporation v. Flores, 345 S.W.2d 432 (Tex.Civ.App.1961, writ ref., n. r. e.), that:

"A plaintiff who establishes his cause of action for conversion is entitled to recover the value of the converted property at the time of the wrongful taking together with interest from that date. 17 Tex.Jur.2d 168, 169. In cases where a mortgagor seeks damages from the mortgagee for wrongful taking of the mortgaged property, recovery is limited to the mortgagor's equity in the property, that is 'to compensation for the loss sustained less the debt owed the mortgagee' ".

See also Runnels Chevrolet Co. v. Clifton, 46 S.W.2d 426 (Tex.Civ.App.1932, no writ); Thos. Goggan and Bros. v. Garner, 119 S.W.2d 341 (Tex.Civ.App.1909, no writ); and cf. Gathright v. Russell, 383 S.W.2d 441 (Tex.Civ.App.1964, writ dism'd). These decisions suggest, particularly in view of the judicial admission of the amount of his existing mortgage debt to SIC, that even under the majority conclusion that "there is some evidence of a conversion", the recovery of Alvarez should be limited to his equity in the automobile.

HAMILTON, REAVLEY, and McGEE, JJ., join in this dissent.