GREEN INTERNATIONAL, INC., f/k/a
the Argee Corporation, and Seaboard
Surety Company, Petitioners

v.

Frank SOLIS, individually and d/b/a
Allied Steel General Contractors,
Respondent.

No. 95–1278.

Supreme Court of Texas.

Argued Oct. 1, 1996.

Decided June 6, 1997.

Rehearing Overruled Oct. 2, 1997.

George C. Baldwin, Paula Fisher Baldwin, Austin, for petitioners.

Dwayne Hoover, Stephen D. Harrison, Patrick J. Maher, Fort Worth, Charles K. Kebodeaux, Beaumont, for respondent.

ENOCH, Justice delivered the opinion of the Court, in which PHILLIPS, Chief Justice, HECHT, CORNYN, SPECTOR, OWEN, BAKER and ABBOTT, Justices, join.

■ In *Dresser Indus., Inc. v. Page Petroleum, Inc.*, 853 S.W.2d 505 (Tex.1993), we held that certain contractual provisions relieving a party in advance for its own negligence must be unambiguous and conspicuous. The principal issue in this case is whether the same rule applies to no-damages-for-delay clauses. The court of appeals held that it does. 932 S.W.2d at 60. We disagree. For this and other reasons, we reverse the judgment of the court of appeals.

The Argee Corporation, now known as Green International, Inc., was the general contractor for the construction of three prison projects for the State of Texas located near Snyder, Dayton, and Woodville. Green contracted with Frank Solis to provide the labor for the steel erection and a portion of the concrete. Solis completed his work for the Snyder Project, but abandoned the Dayton and Woodville Projects before they were completed.

Green sued Solis for breach of contract, fraud, and other claims which are not raised in this appeal. Solis counterclaimed against Green for breach of contract, conversion, fraud, and other claims also not raised in this appeal. Solis added Seaboard Surety Company, Green's surety, as a third party.

The jury found that (1) Green had not paid Solis the contract balance on the Snyder Project; (2) Solis had performed extra work on the Snyder and Dayton Projects for which Green failed to pay; (3) Green breached the subcontracts on the Snyder Project and the Dayton Project by failing to pay Solis, failing to timely purchase materials for Solis, failing to timely submit shop drawings, failing to timely schedule delivery of materials, failing to coordinate the work of other subcontractors, and failing to obtain timely resolution of conflicts in the plans and specifications; (4) Solis did not waive Green's breaches of contract; (5) Solis' failure to complete his work on the Dayton Project was excused by Green's failure to pay Solis; (6) Green's failure to pay Solis was not excused by Solis' actions; (7) Green wrongfully exercised dominion and control over Solis' equipment; (8) Green incurred zero damages from Solis' abandonment of the Woodville Project; (9) Solis' damages from Green's actions totaled $479,559, plus $175,000 in attorney's fees; and (10) Green perfected his bond claim against Seaboard for $95,253.

The trial court disregarded several of the jury's findings and rendered judgment that Solis recover $125,830 in actual damages against Green and that Solis recover $50,058 in actual damages against Seaboard jointly and severally with Green. Both Green and Solis appealed the trial court's judgment. The court of appeals reinstated most of the damages awarded by the jury. Green sought writ of error in this Court. Seaboard joins Green in its appeal to this Court.

## I

### No–Damages–for–Delay Clause

■ Primarily, Green asserts that Solis cannot recover any of his damages resulting from Green's delay because such damages are precluded by the no-damages-for-delay clauses contained in the subcontracts. Solis responds that the subcontract provisions are unenforceable under *Dresser Indus., Inc. v. Page Petroleum, Inc.*, 853 S.W.2d 505, 508 (Tex.1993).

In *Dresser*, the contract provision at issue released Dresser from all liability claims caused by its own future negligence. *Dresser*, 853 S.W.2d at 507. We held that such extra-ordinary risk shifting clauses must meet certain fair notice requirements. *Id.* at 508. First, a party's intent to be released or indemnified from its own negligence must be clear and unambiguous. *Id.; Enserch Corp. v. Parker*, 794 S.W.2d 2, 8 (Tex.1990); *Ethyl Corp. v. Daniel Constr. Co.*, 725 S.W.2d 705, 708 (Tex.1987). Second, the clause must be "conspicuous" as defined under the Uniform Commercial Code. *Dresser*, 853 S.W.2d at 508–11; TEX. BUS. & COM.CODE § 1.201(10).

However, our holding in *Dresser* is explicitly limited to releases and indemnity clauses in which one party exculpates itself from its own future negligence. *Dresser*, 853 S.W.2d at 507 & n. 1. Unlike the provision in *Dresser*, the subcontract agreement in this case provides in pertinent part:

> Contractor [Green] ... shall not be liable to the Subcontractor [Solis] for delay to Subcontractor's work by the act, neglect or default of the Owner, Contractor, action of workmen or others, or any cause beyond Contractor's control.

This clause does not constitute the type of extraordinary risk-shifting found in *Dresser*. It is not an indemnity agreement because it does not shift Green's liability for third party claims to Solis. *Dresser*, 853 S.W.2d at 508. Also, this clause is not a release as defined in *Dresser* because it neither "extinguish[es] the claim or cause of action" nor establishes "an absolute bar to any right of action on the released matter." *Id.*

The distinction between *Dresser* and this case lies in the fact that *Dresser* concerned the shifting of tort and negligence damages, whereas the no-damages-for-delay clause shifts economic damages resulting from a breach of contract. We noted in *Dresser* that most contract clauses operate to transfer risk in some way. *Dresser*, 853 S.W.2d at 508. However, we were concerned with clauses that operate to shift risk in an extraordinary way, such as exculpating a party from the consequences of its own future negligence. *Id.* Here, the parties agreed that Solis would bear the risk that the projects would not be completed on time, even if Green caused the delay. This constitutes a very different type of risk-shifting than that found in *Dresser* where one party had to bear the risk that the other party might negligently damage or injure the oil well or equipment while conducting log tests. Solis and Green did not make a comparable risk-shifting agreement—if Green damaged Solis' equipment while building the prisons, this clause would not prohibit Solis from pursuing a claim against Green for Green's own negligence.

Furthermore, the concerns underlying the *Dresser* opinion are not present in this case.

In *Dresser*, this Court was concerned with the injustice arising when a contracting party buries a provision substantially releasing itself from its own negligence in a way that is inconspicuous and does not provide fair notice to the other party. In the present case, there is no such injustice. Instead, both Green and Solis were experienced contractors familiar with the industry custom of allocating risk for delays.

In sum, we hold that the requirement of conspicuousness set forth in *Dresser* does not apply to no-damages-for-delay clauses. The court of appeals erred in concluding otherwise. Consequently, we must disregard the jury's finding of delay damages against Green because Solis waived delay damages when he signed the subcontracts containing the no-damages-for-delay provision.

## II

### Exceptions to Enforcement of No–Damages–for–Delay Clause

█ Solis alternatively argues that even if the lack of conspicuousness does not invalidate the no-damages-for-delay clause, the jury award for delay damages should still be upheld. Solis asserts that Texas recognizes four exceptions to the enforcement of no-damages-for-delay clauses. These are when the delay: (1) was not intended or contemplated by the parties to be within the purview of the provision; (2) resulted from fraud, misrepresentation, or other bad faith on the part of one seeking the benefit of the provision; (3) has extended for such an unreasonable length of time that the party delayed would have been justified in abandoning the contract; or (4) is not within the specifically enumerated delays to which the clause applies. *City of Houston v. R.F. Ball Constr. Co.*, 570 S.W.2d 75, 77 & n. 1 (Tex. Civ.App.—Houston [14th Dist.] 1978, writ ref'd n.r.e.).

The jury, in response to Question Eight, found that Solis incurred additional expenses on the Snyder and Dayton Projects because of Green's failure to timely deliver materials, failure to deliver properly fabricated materials, failure to provide proper access to the site, and failure to coordinate or resolve con-

flicts between the work of other subcontractors and Solis. In response to Question Twelve, the jury found that Solis' failure to continue work on the Dayton Project was excused by Green's previous failure to pay Solis. Furthermore, in response to Question Three, the jury found that Green did not materially comply with the Snyder and Dayton Subcontracts because it failed to timely purchase metal building material, timely submit shop drawings, timely schedule delivery of materials, coordinate work of other subcontractors, and timely resolve conflicts in plans and specifications. The court of appeals concluded that these jury findings supported two of the recognized exceptions: the delay was unintended by the parties, and the delay extended for an unreasonable amount of time. 932 S.W.2d at 61–62.

The court of appeals also concluded that the jury's findings supported an additional exception, *i.e.* active interference or other wrongful conduct. 932 S.W.2d at 62. The court of appeals reasoned that Green acted arbitrarily and capriciously because it acted willfully and unreasonably without due consideration and in disregard of Solis' rights. *Id.* The court of appeals stated that arbitrary and capricious acts are not protected by a no-damages-for-delay clause. *Id.*

The court of appeals erred. Assuming that these five exceptions preclude the enforcement of no-damages-for-delay clauses, these exceptions have not been established in this case. The jury was not asked, and consequently it did not answer, whether the delay was intended or not contemplated by the parties to be within the purview of the no-damages-for-delay provision, whether the delay extended for such an unreasonable amount of time that Solis would have been justified in abandoning the contract, or whether Green engaged in active interference or wrongful conduct. The findings the jury made merely concern delays. Because none of these specific factors was presented to the jury either by issue or instruction, a judgment predicated on these exceptions cannot stand unless they are established as a matter of law from the record. *See R.F. Ball Constr.*, 570 S.W.2d at 77 (noting that when a party fails to request jury findings on the

exceptions to the no-damages-fordelay clause, then such exceptions must be established as a matter of law). In this case, both parties vigorously contested the facts relating to the delays, who caused the delays, and how long the delays lasted. The record does not establish these exceptions as a matter of law.

### III

### Damage to Credit Reputation

■ We note that Jury Question Fifteen regarding injury to credit reputation was premised on the damages incurred by Solis due to Green's delay on the Dayton project. It reads:

What sum of money, if any, if paid now in cash, would fairly and reasonably compensate Solis for his damages, if any, that resulted from such failure to comply on the Dayton project?

. . .

B. The injury to Solis' credit reputation, if any, that was a natural, probable, and foreseeable consequence of [Green's] failure to comply.

As discussed above, the no-damages-for-delay clause is valid and enforceable. The damages from injury to Solis' credit reputation are barred by the no-damages-for-delay clause.

### IV

### Extra Work

■ Regarding other claims, Green asserts that the waiver of lien releases signed by Solis bar Solis' recovery on his claim for extra-contractual work, and that the court of appeals erred in holding otherwise. While we agree with the court of appeals' judgment on this issue, we disagree with its reasoning.

The jury awarded Solis $44,018 for extra-contractual work performed by Solis on the Snyder and Dayton Projects. However, in return for periodic payments, Solis executed waiver of lien releases every 30 days agreeing to:

[R]elease Contractor from all claims arising out of or by reason of work performed and materials furnished under said subject

Subcontract and under the Contractor's prime contract with the Owner.

The question presented is whether the global language of the releases terminated Solis' recovery for his extra work. Under the Subcontracts, Solis was required to execute the waivers of liens in order to obtain his periodic payments. On the other hand, Section 53.101 of the Property Code requires an owner to retain ten percent of each periodic payment made to the general contractor, and the Subcontracts permitted Green to retain from the periodic payments the same percentage as retained by the owner. *See* Tex. Prop.Code § 53.101. Thus, the Subcontracts contemplated that Solis would execute the waiver of lien releases before receiving one hundred percent of his compensation due.

Additionally, Green approved change orders for the extra work on the Snyder and Dayton Projects several months after Solis had signed the last waiver of lien release. The relevant provision of the Subcontracts provides:

> "Subcontractor agrees to make any changes that the Contractor may require, without nullifying this Subcontract Agreement, at a reasonable addition to, or deduction from, the contract price. No alterations or changes shall be made, however, except under the written order of the Contractor."

The very terms of the Subcontract contemplate written change orders for additional compensation for extra work. These change orders explicitly revised the contract amount due, and thus, modified the Subcontracts. The waivers of liens were executed months before these written modifications were made, and therefore, the releases cannot apply to these subsequent revisions. The waiver of lien releases do not bar Solis' recovery for the extra work.

The court of appeals reasoned that the waiver of lien releases were unenforceable because Green had relinquished its procedural rights under the subcontracts by breaching the subcontracts. 932 S.W.2d at 46. The court of appeals' reasoning is valid only if Green's obligations under the subcontract and Solis' obligation to execute the waiver of lien releases were dependent covenants. *See Hanks v. GAB Bus. Servs., Inc.,* 644 S.W.2d 707, 708 (Tex.1982) ("A prerequisite to the remedy of excuse of performance is that covenants in a contract must be mutually dependent promises."). However, we need not address the issue of whether these covenants were dependent or independent because of our holding that the waiver of lien releases do not bar Solis' recovery for extra work.

## V

### Attorney's Fees

Green next complains that the court of appeals erred in awarding Solis his attorney's fees against Green. The jury awarded $210,000 in attorney's fees against Solis, and $198,000 in attorney's fees against Green. The trial court disregarded both awards for attorney's fees. The court of appeals reinstated the attorney's fees for Solis but declined to award Green its attorney's fees. 932 S.W.2d at 64. We agree with the court of appeals in awarding attorney's fees to Solis.

■ Green argues that in general, attorney's fees are recoverable only for authorized claims. *See International Security Life Ins. Co. v. Finck,* 496 S.W.2d 544, 546–47 (Tex. 1973). A failure to segregate attorney's fees in a case containing multiple causes of action, only some of which entitle the recovery of attorney's fees, can result in the recovery of zero attorney's fees. However, if no one objects to the fact that the attorney's fees are not segregated as to specific claims, then the objection is waived. *Hruska v. First State Bank of Deanville,* 747 S.W.2d 783, 785 (Tex.1988).

■ While the jury question regarding attorney's fees failed to segregate the fees between the different projects and the various claims and defenses, neither party objected to the failure to segregate. Therefore, the error was waived. *Hruska,* 747 S.W.2d at 785. Under these circumstances, a trial court may disregard the jury finding only if it is unsupported by the evidence or it is immaterial. *Spencer v. Eagle Star Ins. Co.*

*of America,* 876 S.W.2d 154, 157 (Tex.1994). In this case, the jury finding awarding attorney's fees was material and was supported by the evidence. Thus, any error in the trial court's failure to segregate attorney's fees in the jury question and instructions was waived and cannot serve as a basis for barring the recovery of attorney's fees.

■ Next, we address Green's argument that either no party should recover attorney's fees or both parties should recover attorney's fees. The trial court found that Green prevailed on the Woodville Subcontract and Solis prevailed on the Snyder Subcontract. Therefore, the trial court reasoned, Green was entitled to recover attorney's fees for the Woodville Subcontract, and Solis was entitled to recover attorney's fees for the Snyder Subcontract. *See* TEX. CIV. PRAC. & REM.CODE § 38.001(8).

■ However, Green was not entitled to recover its attorney's fees. Section 38.001(8) provides that a party "may recover reasonable attorney's fees from an individual or corporation, in addition to the amount of a valid claim and costs, if the claim is for ... an oral or written contract." TEX. CIV. PRAC. & REM.CODE § 38.001(8). To recover attorney's fees under Section 38.001, a party must (1) prevail on a cause of action for which attorney's fees are recoverable, and (2) recover damages. *State Farm Life Ins. Co. v. Beaston,* 907 S.W.2d 430, 437 (Tex.1995). Although the jury found that Solis failed to comply with the Woodville Subcontract, the jury awarded zero damages to Green for this breach. Because Green failed to recover damages on its breach of contract claim, Green was not entitled to recover attorney's fees under Section 38.001. The court of appeals did not err in awarding attorney's fees to only Solis.

## VI

### Fraud

■ Green also complains that the court of appeals erred in remanding the case for a new trial on the issue of fraud. The trial court denied Solis' motion for leave to file a trial amendment for fraud relating to the Woodville contract and Solis' proposed jury

questions on the issue of fraud with respect to the Woodville Subcontract. The court of appeals reversed the trial court's ruling and remanded the case for a new trial on the issue of fraud. 932 S.W.2d at 67. We disagree with the court of appeals.

■ Assuming the trial court erred in failing to permit an amendment of the trial pleadings, the trial court did not err in failing to submit the accompanying jury questions. Each requested jury question must be supported by the evidence. TEX.R. CIV. P. 278. To recover on an action for fraud, the party must prove that: (1) a material representation was made; (2) it was false; (3) when the speaker made the representation he knew it was false or made it recklessly without any knowledge of the truth and as a positive assertion; (4) the speaker made it with the intention that it should be acted upon by the party; (5) the party acted in reliance upon it; and (6) the party thereby suffered injury. *Stone v. Lawyers Title Ins. Corp.,* 554 S.W.2d 183, 185 (Tex.1977).

Solis did not produce evidence of all the elements of fraud. At trial, Solis presented testimony that he had signed the Woodville Subcontract in reliance upon Green's representation that Green would pay Solis the payments due on the Snyder and Dayton Projects. Solis also presented testimony that Green failed to tender the payments due on the Dayton and Snyder Projects as promised. However, this evidence does not support a jury issue on fraud.

Solis failed to produce any evidence that Green's representation was false. Two days after he signed the Woodville Subcontract, Solis abandoned all three projects. Solis produced no evidence that Green would not have paid even if Solis had not abandoned the projects. More to the point, Solis failed to produce any evidence that Green did not intend to pay Solis the amounts due on the other two projects at the time it promised such payment. Thus, the trial court did not err in refusing to submit a jury issue on fraud because the evidence did not support such an issue.

## VII

### Conversion

 The jury found that Solis incurred $30,000 in damages as a result of Green's conversion of Solis' equipment on the Dayton and Woodville Projects. The trial court upheld the jury's award of actual damages but refused to submit a jury question regarding Green's malice and possible exemplary damages for Green's conversion. The court of appeals reversed the trial court and remanded the issue of malice and exemplary damages. 932 S.W.2d at 65. We disagree with the court of appeals.

 Each requested jury issue must be supported by the pleadings and the evidence. TEX.R. CIV. P. 278. Conversion is defined as the wrongful exercise of dominion and control over another's property in denial of or inconsistent with his rights. *Bandy v. First State Bank*, 835 S.W.2d 609, 622 (Tex. 1992). To recover exemplary damages for conversion, the plaintiff must prove that the defendant acted with malice. *Southwestern Inv. Co. v. Alvarez*, 453 S.W.2d 138, 141 (Tex.1970). To establish malicious conversion, the plaintiff must show more than bad faith and wrongful conduct; the plaintiff must show that the wrongful act was of a "wanton and malicious nature." *Ogle v. Craig*, 464 S.W.2d 95, 97 (Tex.1971).

In his pleadings, Solis alleged that he was entitled to recover exemplary damages because Green converted Solis' equipment knowingly. Green argues that because Solis failed to plead malice on conversion, he was not entitled to a jury question on exemplary damages. Solis argues that his pleadings were sufficient to support a jury question on malice and exemplary damages.

Assuming Solis' pleadings support a jury question on exemplary damages for conversion, the trial court's failure to submit the question was not harmful error because Solis presented no evidence of Green's malice. *See* TEX.R.APP. P. 81(b) (providing that a judgment shall not be reversed on appeal unless the error complained of "amounted to such a denial of the rights of the appellant as was reasonably calculated to cause and probably did cause rendition of an improper judg-

ment"); TEX.R. CIV. P. 278 (instructing the court to submit jury questions supported by the evidence).

Solis did present evidence at trial that Green impounded Solis' equipment. However, the Woodville and Dayton Subcontracts permitted Green to impound Solis' equipment. Paragraph 24 of the subcontracts provides the following:

Should Subcontractor at any time breach this Agreement or fail to prosecute the work with promptness, diligence or efficiency, Contractor may, three (3) days after mailing of written notice sent by registered or certified mail or by telegram addressed to Subcontractor at the address set forth at the end of this Subcontract, proceed as follows:

(a) Provide such materials, supplies, equipment and/or labor as may be necessary to complete the Work, and deduct the amount so paid from any money due Subcontractor, or

(b) Terminate this Agreement and enter upon the premises and take possession, for use in completing the work, all of the materials, supplies, tools, equipment and appliances of the Subcontractor thereon and complete the Work....

On August 4, 1989, Green sent Solis written notice of Solis' breach of the Snyder and Dayton Subcontracts. The court of appeals correctly noted that Green failed to give Solis the requisite three-day notice because Green impounded Solis' equipment on August 4, the same day it sent Solis notice. 932 S.W.2d at 65. However, the mere fact that Green failed to comply with the terms of Paragraph 24 does not prove malicious intent on the part of Green. Solis had the burden of proving malice on the part of Green, and Solis failed to produce any evidence of malicious or wanton conduct. *See Southwestern Inv. Co. v. Alvarez*, 453 S.W.2d 138, 141 (Tex.1970) (holding that proof of an unlawful act alone is not enough to support an award of exemplary damages). Therefore, even if Solis' pleadings supported a jury question on exemplary damages, the trial court did not commit reversible error in refusing to submit a jury

question regarding malice and exemplary damages.

## VIII

### Bond Claim

■ Seaboard complains that the court of appeals miscalculated the amount of the bond claim recovery against Seaboard. We agree. As provided by the McGregor Act, a general contractor is required to execute a payment bond on public works projects. TEX.REV.CIV. STAT. art. 5160(A) (Vernon 1987).[1] The payment bonds on the Snyder and the Dayton Projects were furnished pursuant to the McGregor Act. Under the McGregor Act, a subcontractor's recovery on a bond claim must not exceed the amount of the subcontract price. TEX.REV.CIV. STAT. art. 5160(C)(c) (Vernon 1987) ("A subcontractor shall have a claim, but such claim, including previous payments however, shall not exceed that proportion of the subcontract price which the work done bears to the total of the work covered by the subcontract.").

Seaboard was the surety on the payment bonds for all three projects. The jury found that Solis had perfected his claim on his bond for $42,229 on the Snyder Project and $53,024 on the Dayton Project, thus totaling $95,253 against Seaboard. The trial court modified the recovery on the bond to $50,058. The court of appeals reinstated the jury's original finding that Solis had perfected his bond claim of $95,253 against Seaboard.

Solis, however, is entitled to recover only $78,911 on his bond claim against Seaboard for the Snyder and Dayton Projects. The jury found that the remaining balance on the Snyder Project subcontract was $43,983. The jury found a bond claim against Seaboard for $42,229 on the Snyder Project. This recovery is permissible under the McGregor Act because it is less than the amount due on the subcontract. The jury

also found a bond claim against Seaboard for $53,024 on the Dayton Project. However, in a prior question, the jury determined that Green owed a remaining balance of only $36,682 on the Dayton Project. The jury award against Seaboard was more than the amount owed on the subcontract. In order to comply with the McGregor Act, the amount awarded by the jury against Seaboard on the Dayton Project must be reduced to the amount owed on the subcontract, $36,682. Thus, Seaboard is liable for a total of $78,911 on the Dayton and Snyder Projects.

## IX

### Conclusion

In summary, we hold that the *Dresser* requirement of conspicuousness does not apply to no damages-for-delay clauses and that the court of appeals erred in reversing the trial court's judgment barring delay damages and damages for injury to credit reputation. Further, we hold that the court of appeals erred in remanding the issues of fraud and exemplary damages for wrongful conversion. Additionally, we hold that the court of appeals miscalculated the amount of the bond claim recovery against Seaboard. Finally, we hold that the court of appeals correctly allowed Solis to recover damages for the extra work performed on the Snyder and Dayton Projects and his attorney's fees. We reverse the judgment of the court of appeals and remand to the trial court for rendition of judgment in accordance with this opinion.

GONZALEZ, Justice concurring and dissenting.

I join the Court's opinion except for Parts I, II, and III. I disagree with the Court's refusal to apply *Dresser Industries, Inc. v. Page Petroleum, Inc.*, 853 S.W.2d 505 (Tex. 1993), to the "no damages for delay" provi-

---

1. The current version of the McGregor Act can be found in chapter 2253 of the Texas Government Code. For the Snyder and Dayton Projects, the original contracts between Green and the State of Texas, and the subcontracts between Green and Solis, were all entered into before September 1, 1989. Therefore, the version of the McGregor Act that was in effect prior to the 1989 amendments is the applicable law for this case.

*See* Act effective April 27, 1959, 56th Leg., R.S., ch. 93, § 1, 1959 Tex. Gen. Laws 155, *amended by* Act of May 22, 1969, 61st Leg., R.S., ch. 422, § 1, 1969 Tex. Gen. Laws 1390, *amended by* Act of May 23, 1975, 64th Leg., R.S., ch. 713, § 1, 1975 Tex. Gen. Laws 2284, *amended by* Act of May 20, 1977, 65th Leg., R.S., ch. 809, § 1, 1977 Tex. Gen. Laws 2027.

sion at issue in this case. In *Dresser*, we held that a release purporting to relieve a party in advance for its own negligence must meet two "fair notice" requirements to be enforceable: (1) the parties' intent must be clear from the four corners of the writing; and (2) the operative language must be "conspicuous." *Dresser*, 853 S.W.2d at 508–11.

Under *Dresser*, a release is " '[a] contractual arrangement whereby one party assumes the liability inherent in a situation, thereby relieving the other party of responsibility ... [, or an] [a]greement or contract in which one party agrees to hold the other without responsibility for damage or other liability arising out of the transaction involved.' " *Dresser*, 853 S.W.2d at 508 (quoting BLACK'S LAW DICTIONARY 658 (5th ed.1979)). A release, we said, "surrenders legal rights or obligations between parties to an agreement. It operates to extinguish the claim or cause of action as effectively as would a prior judgment between the parties and is an absolute bar to any right of action on the released matter." *Id.* (citations omitted).

"Delay damages" is a term of art in the construction industry referring to compensable damage from a delay that could have been avoided by due care. The relevant provisions of the subcontracts in this case read as follows:

[E]xcept as provided for in this paragraph ..., [Green] shall not be liable to [Solis] for delay to [Solis]'s work by the act, neglect or default of the Owner, [Green], or the Architect, or by reason of fire, act of God, riot, strike, action of workmen or others, or any cause beyond [Green]'s control.

(a) [Green] will be liable to [Solis] for damages incurred as a result of any acts, or failures to act, by the Owner which delays the Work, only if and to the extent the Owner is liable and pays [Green] for such damages.

(b) Should [Green] delay [Solis] in the work, [Solis] shall receive an extension of time for completion equal to delay if a written claim is made within forty-eight hours, and under no circumstances shall [Green] be liable to pay to [Solis] any compensation for such [Green]-caused delays.

This clause transfers all risk of delay damages to Solis. If operative, it relieves Green in advance of any liability for such damages and surrenders Solis's right to recover them from Green. In very plain language, it releases Green from any liability resulting from delays. I therefore disagree with the Court's conclusion that "this clause is not a release as defined in *Dresser*." 853 S.W.2d at 507.

Additionally, the delay-damages provision would exculpate Green in advance for delays caused by its own negligence. The only significant difference between this release and the one at issue in *Dresser* is that this release is broader. It is not limited to negligence, but may also be construed to absolve Green of liability for its own intentional acts that delay Solis's work. The policy underlying *Dresser*'s imposition of fair-notice standards, which protect parties from waiving their right to recover for negligence, applies with even greater force here. Because the delay-damages provision meets *Dresser*'s definition of release, and because the same policy concerns arise regarding this particular risk-shifting provision, I would apply the two-part *Dresser* test to the facts of this case.

The court of appeals, having reached the same conclusion, determined that the release language did not meet the fair notice requirement of conspicuousness. 932 S.W.2d 39, 61. A release is conspicuous "[w]hen a reasonable person against whom a clause is to operate ought to have noticed it.... For example, language in capital headings, language in contrasting type or color, and language in an extremely short document, such as a telegram, is conspicuous." *See Dresser*, 853 S.W.2d at 511 (citing TEX. BUS. & COM. CODE § 1.201(10)). I agree with the court of appeals' conclusion that the release violates *Dresser*'s conspicuousness element. The release is located within a multi-page, single-spaced contract typed solely in black ink. Unlike later-appearing indemnity provisions, it has no special heading setting it apart, and its typeface is the same as the rest of the document. Nothing calls one's attention to it while skimming the surrounding page. Because the printed release language is not of a

nature that would advise a reasonable person of its potential detrimental effects, I would hold that the clause is inconspicuous.

For these reasons, and for the reasons stated in the court of appeals' opinion, 932 S.W.2d at 59–61, I would hold that *Dresser*'s fair notice requirements apply to this case and that Green's attempt to exculpate itself from delay damages is unenforceable as a matter of law. Accordingly, I would affirm that part of the court of appeals' judgment reinstating the jury's award of delay damages to Solis.