Opinion filed October 18,
2012

 

                                                                       In The

                                                                              

  Eleventh
Court of Appeals

                                                                   __________

 

                                                         No. 11-11-00033-CV

                                                    __________

 

      SCS BUILDERS, INC.
AND SONNY CALVIN SPOON, Appellants

 

                                                             V.

 

                                       SHERRI
SEARCY, Appellee



 

                                   On
Appeal from the 70th District Court

                                                             Ector
County, Texas

                                                  Trial
Court Cause No. A-125,846

 



 

                                                                  O
P I N I O N

 

            Sherri
Searcy sued SCS Builders, Inc. and Sonny Calvin Spoon in connection with the
construction of a home that they agreed to build for her.  SCS and Spoon filed
a counterclaim against Searcy for defamation related to certain internet and
other comments allegedly made about them, and they sought damages of
$1,000,000.  The trial court granted judgment for “actual and/or economic
damages” as well as additional damages to Searcy on various violations of the Deceptive
Trade Practices-Consumer Protection Act.[1]
 In the alternative, the trial court awarded Searcy damages in connection with
the judgment on her common-law fraud claims.  The trial court awarded trial
court attorney’s fees to Searcy in the amount of $20,000 and additional
attorney’s fees in the event of an appeal to the court of appeals and to the Texas
Supreme Court.  The trial court entered a take-nothing judgment on SCS and
Spoon’s defamation counterclaim.  We affirm.

            This
case finds its genesis at a time when Searcy decided to have a home built for her
son and his family.  She wanted to locate it at the rear of property already
owned by her and upon which her own home sat.  In the course of selecting a
builder to construct the new home, Searcy saw SCS’s sign at a property upon
which SCS was working.  Searcy contacted Spoon, SCS’s owner, about her own
project.  Spoon showed Searcy, her son, and her daughter-in-law some of the work
that he and SCS had performed.  Searcy also saw some of SCS and Spoon’s
advertising.  Spoon told Searcy that she was in good hands with SCS and Spoon and
that she could trust them.

            Searcy
and Spoon discussed the fact that it was important that they finish the home by
December 2007 so that Searcy’s son and his family could move into it then. 
Searcy’s son, daughter-in-law, and their two-year-old daughter lived in a one-bedroom
apartment, and the lease on that apartment was set to expire around that time. 
Additionally, Searcy’s son and his wife were expecting a new baby in December. 
The evidence shows that Spoon understood the importance of the completion date
and that he represented many times that they would finish the home by then.

            Ultimately,
Searcy entered into an agreement with SCS and Spoon whereby they agreed to
build the home for her for $68,300.  The parties signed an agreement on
September 25, 2007.  By October 25, 2007, within a month after the contract was
signed, Searcy had paid SCS and Spoon $61,470; the total balance remaining on
that date was $6,830.

            The
desired December completion date was not made a part of the agreement that the
parties signed.  According to Spoon, SCS and Spoon “badly missed that
deadline.”  Searcy fired SCS and Spoon in January 2008.  For five consecutive
weeks during the period between the date that the parties signed the agreement
and the date Searcy fired SCS and Spoon, no one showed up to work on the
project.  Spoon acknowledged that they messed up on Searcy’s work, but he said that
it “wasn’t from a premeditated stance.”  Spoon testified that, at the time they
were doing Searcy’s project, “we had about 30 jobs in progress and we had
already completed about a hundred.”  He was also remodeling his own house.

            The
record shows that, when SCS and Spoon did not finish the home by the time Spoon
said they would, Searcy and her husband—a victim of a type of Parkinson’s
disease—and their daughter had to make room in their own home for Searcy’s son,
his wife, their two-year-old daughter, as well as their newborn baby.  Searcy’s
son and his family lived in Searcy’s den for approximately twenty months while
the new home was being completed by the Searcys and other contractors that they
had hired.  Searcy testified that SCS and Spoon’s failure to have the home
ready caused her anguish.  Searcy suffered many sleepless nights and shed many
tears.  The living situation was a strain on everyone and resulted in family
fights.  She testified that, as far as physical symptoms were concerned, “I
don’t know how to go about putting it in words.”   The trial court found that
Searcy suffered great hardship when the home was not completed on time.  In his
testimony, Spoon agreed that Searcy suffered “extreme hardship.”

            As
far as the quality of the work performed by SCS and Spoon, it is undisputed
that SCS and Spoon’s work was substandard.  The trial court found many areas in
which SCS and Spoon’s work was faulty.  SCS and Spoon built the house so that
it was “improperly oriented”: the front faced north rather than west as it
should have faced.  The front door was located where the back door should have
been.  There were problems with the foundation, the doors, the windows, the
plumbing, and many other things.  Searcy spent approximately $76,016—in addition
to the $61,470 she had already paid to SCS and Spoon—to “remediate” the work
that SCS and Spoon did not perform correctly.  That amount included various
inspection and attorney’s fees—the amounts of which are not reflected in the
record.  The trial court found that, although SCS and Spoon had “completed some
work, it was ‘not good work’” and that Searcy had gotten “little or no value
for the money she paid” to SCS and Spoon.

            Searcy
sued SCS and Spoon for alleged violations of the DTPA in that they used or
employed false, misleading, or deceptive acts or practices listed in Section
17.46(b) of the DTPA when they: (1) represented that goods or services had
sponsorship, approval, characteristics, ingredients, uses, benefits, or
quantities that they did not have or that SCS and Spoon had sponsorship,
approval, status, affiliation, or connections that they did not have and (2) represented
that goods or services were of a particular standard, quality, or grade when
they were of another.  Searcy also pleaded that SCS and Spoon breached the
implied warranty of fitness for a particular purpose and the implied warranty
of good and workmanlike performance and sought recovery under Section
17.50(a)(2) of the DTPA.  Searcy alleged that she relied upon each of those
false, misleading, or deceptive acts or practices.  Searcy further alleged that
SCS and Spoon engaged in an unconscionable action or course of action when they
took advantage of her lack of knowledge, ability, experience, or capacity to an
unfair degree in violation of Section 17.50(a)(3) of the DTPA.  In
addition to her DTPA claims, Searcy also pleaded causes of action for common-law
fraud, negligent performance of the duty to construct the house in accordance
with specifications, and breach of contract.

            After
Searcy filed this lawsuit, the parties entered into a settlement agreement. 
Spoon testified that he paid Searcy $12,000 toward that settlement, but later
refused to pay any more.   Spoon admitted that Searcy had a legitimate
complaint about the work they did, that she had every right to be unhappy with
the work, and that he did not blame Searcy for firing SCS and him.  Spoon
testified that his work was “piss poor work.”  From its findings of fact and
conclusions of law, it is apparent that the trial court was of the opinion that
the evidence supported Spoon’s assessment of the quality of the work.  However,
the trial court did not found its judgment on a breach-of-contract theory. 
Rather, the trial court based its judgment upon the violation of duties outside
the contract that are imposed statutorily under the DTPA and upon remedies that
are provided for in the DTPA.

            SCS
and Spoon present us with seven issues on appeal.  

            In
their first issue, SCS and Spoon argue that the DTPA claims sounded in contract,
not in the DTPA.  They argue that the evidence is both legally and factually
insufficient to elevate the claims to a DTPA action.

            In
an appeal from a bench trial, the trial court’s findings of fact have the same
force and effect as jury findings.  Anderson v. City of Seven Points,
806 S.W.2d 791, 794 (Tex. 1991).  We review a trial court’s findings of fact
under the same legal and factual sufficiency of the evidence standards that we
use when we determine whether sufficient evidence exists to support an answer
to a jury question.  Kennon v. McGraw, 281 S.W.3d 648, 650 (Tex. App.—Eastland
2009, no pet.).

            When
we review evidence for legal sufficiency after a bench trial, we consider all
of the evidence in the light most favorable to the trial court’s judgment.  We
credit any favorable evidence if a reasonable factfinder could and disregard
any contrary evidence unless a reasonable factfinder could not.  City of
Keller v. Wilson, 168 S.W.3d 802, 821–22 (Tex. 2005).  In a factual
sufficiency review, we consider all the evidence and will uphold the trial
court’s finding unless the evidence is too weak to support it or the finding is
so against the overwhelming weight of the evidence as to be manifestly unjust. 
Serv. Corp. Int’l v. Aragon, 268 S.W.3d 112, 118 (Tex. App.—Eastland
2008, pet. denied).

            We
review a trial court’s conclusions of law de novo.  BMC Software Belgium,
N.V. v. Marchand, 83 S.W.3d 789, 794 (Tex. 2002).  We independently
evaluate conclusions of law to determine whether the trial court correctly drew
the legal conclusions from the facts.  Walker v. Anderson, 232 S.W.3d 899,
908 (Tex. App.—Dallas 2007, no pet.).  We will uphold the trial court’s
conclusions of law if any legal theory supported by the evidence can sustain
the judgment.  OAIC Commercial Assets, L.L.C. v. Stonegate Vill., L.P.,
234 S.W.3d 726, 736 (Tex. App.—Dallas 2007, pet. denied).  We will reverse the
judgment of the trial court only if the conclusions are erroneous as a matter
of law.  Id.

            The
economic loss rule “govern[s] recovery of economic losses in selected areas of
the law.”  Sharyland Water Supply Corp. v. City of Alton, 354 S.W.3d
407, 415 (Tex. 2011) (quoting Vincent R. Johnson, The Boundary-Line Function
of the Economic Loss Rule, 66 Wash.
& Lee L. Rev. 523, 534–35 (2009)).  In Sharyland, the court
reviewed the history of the rule in Texas.  A part of that review included a
discussion of Southwestern Bell Telephone Co. v. DeLanney, 809 S.W.2d
493 (Tex. 1991).  DeLanney based his claim upon Southwestern Bell’s negligent
failure to publish a Yellow Pages advertisement.  The court held, “When the
only loss or damage is to the subject matter of the contract, the plaintiff’s
action is ordinarily on the contract.”  809 S.W.2d at 494.  The Sharyland
court explained that, “because the plaintiff sought damages for breach of a
duty created under contract, as opposed to a duty imposed by law,
tort claims were unavailable.”  354 S.W.3d at 417 (emphasis added).

            The
court also examined its previous case of Jim Walter Homes, Inc. v. Reed,
711 S.W.2d 617 (Tex. 1986), a negligent construction case.  In Jim Walter
Homes, the court said, “The acts of a party may breach duties in tort or
contract alone or simultaneously in both.”  711 S.W.2d at 618.

            Previously,
the court has stated the general proposition that the mere breach of a contract
does not constitute a false, misleading, or deceptive act under the DTPA.  Ashford
Dev., Inc. v. USLife Real Estate Servs. Corp., 661 S.W.2d 933, 935 (Tex.
1983).  This rule is based upon the general proposition that, when the injury
is only the economic loss to the subject of a contract itself, the action
sounds in contract alone.  Sharyland, 354 S.W.3d at 417.  The supreme
court has said that we are to consider “both the source of the defendant’s duty
to act (whether it arose solely out of the contract or from some common-law
duty) and the nature of the remedy sought by the plaintiff.”  Crawford v.
Ace Sign, Inc., 917 S.W.2d 12, 13 (Tex. 1996).

            However,
in Sharyland, the court pointed to a number of areas in which pure
economic loss is commonly recoverable outside the contract arena.  Sharyland,
354 S.W.3d at 417.  One distinguishing factor seems to be that, when the source
of the duty lies outside the contract, economic damages are recoverable.  An
example of such a factor is found in a cause of action for fraudulent
inducement, to which example the Sharyland court referred when it cited Formosa
Plastics Corp. USA v. Presidio Engineers & Contractors, Inc., 960
S.W.2d 41 (Tex. 1998).  There, the court declined to extend DeLanney to
a fraudulent inducement claim even though the only damages were economic ones. 
The court noted that “Texas law has long imposed a duty to refrain from
fraudulently inducing a party to enter into a contract, and . . . tort damages
[are] not precluded simply because a fraudulent representation caused only an
economic loss.”  Sharyland, 354 S.W.3d at 417.  The duty arose outside
the contract.

            In
its opinion in Sharyland, the court cited other examples of cases wherein
the courts commonly allowed recovery of pure economic loss: negligent
misrepresentation; legal or accounting malpractice; breach of fiduciary duty;
fraud; fraudulent inducement; tortious interference with contract; nuisance;
wrongful death claims related to loss of support from the decedent; business
disparagement; and some statutory causes of action.  Sharyland, 354
S.W.3d at 418–19.

            In
this case, the trial court found that Spoon told Searcy that she could trust
SCS and him, that she was in good hands with them, and that they would complete
the contract by December.  Based upon these findings, the trial court concluded
that SCS and Spoon used or employed false, misleading, or deceptive acts or
practices under Section 17.50(a)(1) of the DTPA, as set forth in Section 17.46(b)
of the DTPA.  The trial court further found that SCS and Spoon used or employed
false, misleading, or deceptive acts or practices under Section 17.50(a)(1) of
the DTPA, as set forth in Section 17.46(b) of the DTPA, when they advertised to
the public that they would perform quality work.  These findings are supported by
the evidence as we have discussed earlier in this opinion.

            The
trial court also found that SCS and Spoon had engaged in an unconscionable
action or course of action under Section 17.50(a)(3) of the DTPA.  SCS and
Spoon made it clear in their reply brief that they are contesting the trial court’s
judgment on this ground.

            An
unconscionable action or course of action is defined in Section 17.45(5) of the
DTPA as “an act or practice which, to a consumer’s detriment, takes advantage
of the lack of knowledge, ability, experience, or capacity of the consumer to a
grossly unfair degree.”  We determine whether the consumer was taken advantage
of to a grossly unfair degree by looking at the entire transaction, not just at
whether a defendant actually intended to take advantage of the consumer.  Chastain
v. Koonce, 700 S.W.2d 579, 583 (Tex. 1985).  Whether an action takes
advantage of a consumer “to a grossly unfair degree thus requires a showing
that the resulting unfairness was glaringly noticeable, flagrant, complete and
unmitigated.”  Id. at 584.  

            Searcy
was not in the construction business; she ran Golden Brew Coffee.  On the other
hand, Spoon testified that he had twenty-five years experience in the construction
business.   Spoon had been involved in the construction business from age seventeen
to age thirty-six acting as a laborer, supervisor, “and everything you could
pretty much think of is what we did.”  Two of his construction businesses had
failed.  Furthermore, the record shows that Spoon knew that he had $60,000 in
hot checks that he had written and that, when he wrote the checks, he had no
money to cover them.  He knew that he was facing felony criminal charges if he
did not come up with $60,000 to cover the checks; the district attorney’s staff
had talked to him about the checks.  Searcy had paid SCS and Spoon $61,470
within a month of the start of the project.  She owed them a remainder of only
$6,830 for the entire project, although, according to Spoon’s own testimony, he
and SCS had completed only four items under the contract.

            The
trial court found that Searcy received little or no value as a result of the
work performed by SCS and Spoon, yet she had paid them $61,470 in the first
month and had to borrow money to complete the project after she fired SCS and
Spoon.  Spoon knew that he “owed everybody” in town and in Andrews.  Spoon also
knew that previously he had been arrested in another county for theft after he
did not complete another construction job.  He also knew that he could operate
only as he received revenue.  Spoon knew that SCS was failing, and he was under
a tremendous amount of strain.  Spoon testified that the Searcy project
escalated his problems.

            When
the court in Sharyland included “some statutory causes of action” among
those in which pure economic losses were recoverable, it cited Section 17.50 of
the DTPA as authorizing the recovery of economic damages, as defined in Section
17.45 of the DTPA, for certain deceptive trade practices.  Sharyland,
354 S.W.3d at 419 n.24.  Under the record in this case, we hold that the duty breached
by SCS and Spoon: to refrain from engaging in or using deceptive trade
practices as set out in Section 17.50(a)(3)—unconscionable actions or courses
of action—was one that, as in Formosa Plastics, arose outside, and existed
independently of, the contract.  We also believe that the “nature of the
remedy”—to use the language from Crawford—for a violation of those
statutorily imposed duties is contained in Section 17.50(b)(1) of the DTPA:
recovery of economic damages; attorney’s fees; costs; and, among other things,
potentially, additional damages.  917 S.W.2d at 17.

            The
trial court’s findings that SCS and Spoon told Searcy that she was in good
hands with them, that she could trust them, and that the project would be
finished by December are supported by the record.  And we hold that, under the
well-settled standards of review set forth earlier in this opinion, the
evidence is legally and factually sufficient to show that, knowing what Spoon
knew and with Spoon’s vast construction background, SCS and Spoon engaged in
acts and practices which, to Searcy’s detriment, took advantage of her lack of
knowledge, ability, and experience to a grossly unfair degree to the extent
that the resulting unfairness was glaringly noticeable, flagrant, complete, and
unmitigated, as provided for in Section 17.50(a)(3) of the DTPA.  As noted
above, under the facts of this case, these are duties that arose outside the
contract that SCS and Spoon had with Searcy; they arose statutorily under the
DTPA and were not later subsumed in the contract.  The trial court did not err
if it granted Searcy’s judgment on these grounds.  Issue One is overruled.

             Because
we have found that the trial court did not err when it held that SCS and Spoon used
or employed false, misleading, and deceptive acts or practices as enumerated in
Section 17.46(b) of the DTPA and that they engaged in an unconscionable
action or course of action under Section 17.50(a)(3) of the DTPA, we will not
address other theories of recovery under Section 17.46(b)(5) and (7) of the
DTPA, breach of warranty or fraud (including exemplary damages associated with
that claim); they are not necessary to our final disposition of this appeal.  Tex. R. App. P. 47.1.  We will proceed
to discuss the damage award.

            A
consumer who prevails in a DTPA claim—and we have held that Searcy did—is entitled
to recover economic damages under Section 17.50(b)(1).  As used in that
section, “economic damages” “means compensatory damages for pecuniary loss,
including costs of repair and replacement.”  Section 17.45(11). 
The definition excludes certain items, but they are not relevant to our
discussion.  See id.

            SCS
and Spoon make various assaults on the damage award.  In Issue Three, they argue
that the trial court could not award damages to Searcy for her mental anguish. 
A close examination of the amended judgment in this case reveals that the trial
court did not make any award for mental anguish.  It made findings regarding
mental anguish, but those findings did not result in the award of any damages
for mental anguish.  While we may not disregard findings merely because they
are superfluous, SCS and Spoon cannot show that any error committed by the
trial court when it made the findings either probably caused the rendition of
an improper judgment or prevented SCS and Spoon from properly presenting this
appeal.  Tex. R. App. P. 44.1;
Merry Homes, Inc. v. Chi Hung Luu, 312 S.W.3d 938, 950–51 (Tex. App.—Houston
[1st Dist.] 2010, no pet.).  Because the trial court did not award mental
anguish damages, Issue Three is overruled.

            Because
we have upheld the judgment of the trial court under other provisions of the
DTPA, we need not reach SCS and Spoon’s claims in Issue Two regarding breach of
implied warranties of fitness and good and workmanlike manner.  For the same
reason, as well as the reason that fraud relief was only alternatively awarded,
we do not reach SCS and Spoon’s claims in Issues Four and Five that the trial
court erred when it granted relief for Searcy’s fraud cause of action and the
damages awarded in connection with that claim.

            In
Issue Six, SCS and Spoon “challenge the legal and factual sufficiency of the
evidence to support the Trial Court’s award of $49,470 as actual damages.” 
They base their argument on the evidence and the findings of the trial court to
the effect that four items of the contract were completed: purchase and install
the concrete foundation; purchase and install a metal building; purchase and install
six windows; and purchase and install three exterior doors.  They maintain that
to award Searcy $49,470 (the amount of the contract price paid to SCS and Spoon
($61,470) less the refund paid to Searcy ($12,000)) is to ignore the value of
the four items that they completed and from which Searcy benefited.

            The
trial court also found, and each finding is supported by the evidence, that,
even though SCS and Spoon completed some work, that work was completed unsatisfactorily
for several reasons.  Other items were partially completed, and SCS and Spoon
performed no work on other items.  The trial court found that Searcy received
little or no value for the money she paid to SCS and Spoon.  There is no other
testimony of the value of the items as completed.  We hold that the evidence is
both legally and factually sufficient to support the judgment and that, in the
absence of other objections, the trial court correctly computed Searcy’s
economic damages under Section 17.50(b)(1) of the DTPA.  Other than the
argument related to mental anguish damages and the position taken by SCS and
Spoon that, if the economic damage award was incorrect, then additional damages
would be improper, there has been no other challenge to the award of damages. 
Issue Six is overruled.

            In
Issue Seven, SCS and Spoon argue that the trial court erred when it did not
segregate recoverable attorney’s fees from unrecoverable ones.  In their reply
brief, SCS and Spoon acknowledge that they did not ask the trial court to
segregate trial court attorney’s fees.  Because no request for segregation was
made, Issue Seven is overruled.  See Green Int’l, Inc. v. Solis, 951
S.W.2d 384, 389 (Tex. 1997) (in the absence of an objection to the fact that
attorney’s fees are not segregated, the objection is waived).

            The
judgment of the trial court is affirmed.

 

 

                                                                                                JIM
R. WRIGHT

                                                                                                CHIEF
JUSTICE

 

October 18,
2012

Panel[2]
consists of: Wright, C.J.,

McCall, J., and Hill.[3]









[1]All references to the DTPA are to Tex. Bus. & Com. Code Ann. ch. 17,
subch. E (West 2011 & Supp.
2012).





[2]Eric Kalenak, Justice, resigned effective September 3,
2012.  The justice position is vacant pending appointment of a successor by the
governor or until the next general election.

 





[3]John G. Hill, Former Chief Justice, Court of Appeals,
2nd District of Texas at Fort Worth, sitting by assignment.