# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-03-00383-CV

**Susan Gasparotto, Individually and d/b/a Onion Creek Ranch, Appellant**

**v.**

**Gallagher Power Fence, Inc., Appellee**

### FROM THE DISTRICT COURT OF MCCULLOCH COUNTY, 198TH JUDICIAL DISTRICT
### NO. 2002-005, HONORABLE EMIL KARL PROHL, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

Appellant, Suzanne Gasparotto, appeals a judgment in favor of Gallagher Power Fence, Inc. ("Gallagher") following a jury trial. Gasparotto alleged that Gallagher misrepresented the effectiveness of electric fencing it sold to her for her goat ranch in Lohn, Texas. She sued Gallagher under the Texas Deceptive Trade Practices Act ("DTPA"), as well as for breach of contract, breach of warranty, and promissory estoppel. The jury found in favor of Gallagher and awarded reasonable attorney's fees. In two issues, Gasparotto appeals the judgment of the district court, contending that the court erred in awarding attorney's fees to Gallagher and that the court erred in admitting the testimony of goat expert, Dr. Phillip Sponenberg. We affirm the judgment of the district court.

**FACTUAL BACKGROUND**

Gasparotto is a goat rancher who raises and breeds myotonic goats.[1] She has approximately 600 goats in her herd. Gasparotto first began dealing with Gallagher in 1997 when she was interested in replacing some fencing on her ranch in Buda, Texas. Gasparotto's business partner, David Goll, contacted his friend Larry Wilkes, a Gallagher sales representative, and asked him to meet with Gasparotto because she was considering using electric fence on her ranch. Wilkes met with Gasparotto at her ranch in Buda and discussed the installation of electric fencing to replace approximately 2,000 feet of old fence that was in need of repair along one side of the ranch. Gasparotto expressed her concerns that the electric fencing contain the goats, keep out predators, and not harm the goats. She explained to Wilkes the idiosyncratic nature of myotonic goats and even demonstrated one stiffening and falling over. Wilkes assured Gasparotto that the Gallagher electric fencing would contain the goats and keep out predators. He arranged for delivery of the fence and assisted Goll with installing a five-wire electric fence.

Soon after the fence was installed at the Buda ranch, a goat was found dead in the fence. Gasparotto testified at trial that she discovered the goat leaning up against the fence with its horns hung in the fence. She testified that she ran as fast as she could to disconnect the fence charger and came back and removed the goat from the fence. Goll described the incident differently. He

---

[1] Several witnesses discussed the unique characteristics of myotonic goats at trial. Myotonic goats are a rare breed of goat that has a high meat to bone ratio, making it a valuable goat for meat production. Myotonic goats are also known as "fainting" goats. When startled, the goat's muscles contract and remain contracted for several seconds. This often causes the goat to fall over prior to regaining control of its muscles.

testified that he pulled the goat from the fence and that the electric fence jolted him as he removed the dead goat.

Gasparotto informed Wilkes of the goat's death, and Wilkes suggested a modification of the fence. Once the modifications were completed, no other goats were lost to the electric fence at the Buda ranch.

Gasparotto subsequently bought a larger ranch in Lohn, Texas, and began preparations to move her goats to the new ranch. She had an architect create plans for pasture fencing and had Goll contact Wilkes in order to discuss the purchase of electric fencing for the Lohn ranch. Wilkes visited Gasparotto at her Buda ranch in early 2000 to discuss the new fences. As a result of this meeting, Gasparotto ordered electric fencing for the pastures in the Lohn ranch. In the summer of 2000, more electric fencing was ordered for the breeding pens at the Lohn ranch. The accounts of the conversations between Gasparotto and Wilkes regarding these purchases differed at trial.

Gasparotto testified that she had originally planned to use non-electric fencing for the entire Lohn ranch and expressed great concern that electric fencing might be harmful to her goats. She testified that she described her breeding operation to Wilkes and that Wilkes assured her that the fence would be safe for her goats. She also testified that Wilkes told her the Gallagher company had tested its fences on myotonic goats at a facility in San Antonio and that the fences were safe, would contain the goats, and would keep predators out. Gasparotto stated that she had not previously decided to use electric fencing, but that Wilkes convinced her to use the electric fencing for her pastures. She then testified that Wilkes called her in the summer of 2000 and recommended that she use electric fencing in the breeding pens at the Lohn ranch. She testified that he told her it was

3

"stupid" to spend the money on non-electric fences when the Gallagher electric fences would be cheaper and work "wonderfully" in the pens. She stated that the use of electric fences in the breeding pens at the Lohn ranch was Wilkes's idea.

Wilkes gave a different account of the conversations. He testified that Goll asked him to contact Gasparotto because she wanted to order electric fencing for her new ranch in Lohn. He testified that Gasparotto informed him during the meeting at the Buda ranch that she wanted to use electric fence in the pastures, but that the breeding pens would not be electric. He took down measurements from a map of the planned fences for the order. He disputed Gasparotto's testimony that he had persuaded her to use electric fencing and stated that she had advised him she decided to use electric fencing prior to his visit to the Buda ranch. Wilkes also denied ever calling Gasparotto and suggesting that she use electric fence in the breeding pens. He recounted making a trip out to the Lohn ranch to check on the installation of the pasture fence and being surprised that electric fencing was being installed in the breeding area. He testified that Goll informed him it was Gasparotto's idea to use the electric fence in that area.

By October 2000, the electric fences were installed in the breeding pens and Gasparotto moved in goats. Gasparotto testified that four goats died in the breeding pens within the first twenty-one days. She testified that a goat named Noel, an eighteen-month-old myotonic doe, was the first to die. Noel was discovered wedged in between the electric fence and a shed. A goat named Faye died next. Gasparotto testified that Faye was found dead laying against the fence with one horn hung over the fence. "Julie" was found dead several days later with one horn hung up on the fence and her body slumped against the fence. Gasparotto later admitted that she was not sure whether Faye

4

or Julie died first. Finally "Inez," a two- to three-year-old myotonic, was found dead slumped against the fence with one horn hung over the wires on November 18. In each of the deaths, the electric fence was still active when the body was discovered. All of the deaths occurred in the breeding pens.

Bert Bratton was an eyewitness to one of the deaths. Bratton testified that he was digging water lines on the Lohn ranch when he saw a nanny rub up against the fence and fall "as if it was hit in the head with a hammer." He testified that the goat fell away from the fence and that no part of the goat was in the fence. The goat never got up.

After the death of Inez, Gasparotto took the goats out of the breeding pens. She contacted Wilkes repeatedly regarding the deaths. Wilkes testified that Gasparotto was distressed about the loss of her goats and once woke him up at night calling him at home about the loss of one of the goats. He also testified that she called his home and complained to his wife about the problem. Gallagher then sent Wilkes and two other employees out to the Lohn ranch to inspect the fences. Gasparotto sent a letter to Gallagher dated December 11 thanking them for the visit and requesting that Gallagher reimburse her in the amount of $2,450 for the value of Noel, Faye, and Julie. The letter stated that Noel died on October 24, Faye was killed on October 31, and Julie was killed on November 18, 2000. There was no mention of the fourth goat Inez, whom Gasparotto later testified died on November 18. Gallagher sent a letter informing Gasparotto that the fence was installed to Gallagher specifications, but offered suggestions on how Gasparotto could modify the breeding pens to avoid the loss of more goats. The letter advised Gasparotto that her claim for reimbursement would be forwarded to the president of the company, Erwin Quinn. In January of 2001, Gasparotto ordered more electric fencing and installed cross fences in some of the Lohn ranch pastures.

Gasparotto also presented testimony regarding problems with the fence in containing kids. She testified that, in the spring of 2001, the recently born kids and their mothers were brought into a pen so that the kids could be vaccinated and tagged. She stated that the kids were able to run through the electric fence in the pens without any difficulty and that the electric fence was not effective in containing the kids. Bratton and ranch employee, Joe Medrano, also testified that the kids were not contained by the fence.

On May 3, 2001, Gasparotto wrote Gallagher explaining the problems she was having with the kids and requesting reimbursement for $10,802.77 expended in retrofitting the Gallagher fence with non-electric net fencing. She explained that it might also be necessary for her to re-fence the entire property and that she believed the safety and usefulness of the Gallagher fence was misrepresented to her. Gasparotto ultimately refitted all of the fencing at the Lohn ranch and sought reimbursement from Gallagher. Gallagher refused to pay for the goats and the majority of the expense related to the fence, and Gasparotto then brought suit for damages.

## DISCUSSION

**Attorney's Fees**

Gasparotto first contends that the district court's award of attorney's fees was error. Gallagher was awarded attorney's fees under two theories. Gallagher filed a counterclaim against Gasparotto under section 17.50(c) of the DTPA, alleging that Gasparotto's suit was groundless, brought in bad faith, or brought for purposes of harassment. *See* Tex. Bus. & Com. Code Ann. § 17.50(c) (West 2002). Gallagher also sought fees as a prevailing party under chapter 38 of the

6

Texas Civil Practice and Remedies Code. *See* Tex. Civ. Prac. & Rem. Code Ann. § 38.001 (West 1997).

We first discuss whether the district court erred in awarding fees pursuant to section 17.50(c) of the DTPA. The trial court, not the jury, determines groundlessness, bad faith, or harassment under section 17.50(c). Tex. Bus. & Com. Code Ann. § 17.50(c); *Donwerth v. Preston II Chrysler-Dodge, Inc.*, 775 S.W.2d 634, 637 n.3 (Tex. 1989). We review the trial court's determination under an abuse of discretion standard. *See Donwerth*, 775 S.W.2d at 637 n.3. A trial court abuses its discretion when it acts in an arbitrary or unreasonable manner, or when it acts without reference to any guiding rules or principles. *Beaumont Bank, N.A. v. Buller*, 806 S.W.2d 223, 226 (Tex. 1991). The mere fact that a trial court may decide a matter within its discretion differently than an appellate court in a similar circumstance does not demonstrate that an abuse of discretion occurred. *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241-42 (Tex. 1985). There is no abuse of discretion when a trial court bases its decision on conflicting evidence. *Davis v. Huey*, 571 S.W.2d 859, 862 (Tex. 1978).

In determining whether a suit is "groundless" for purposes of section 17.50(c) of the DTPA, the trial court considers "whether the totality of the tendered evidence demonstrates an arguable basis in fact and law for the consumer's claim." *Splettstosser v. Myer*, 779 S.W.2d 806, 808 (Tex. 1989); *Donwerth*, 775 S.W.2d at 637 ("groundless" in the DTPA has same meaning as in rule of civil procedure 13). The survival of a motion for directed verdict does not necessarily exclude a finding that a case is groundless. *Splettstosser*, 779 S.W.2d at 808; *Zak v. Parks*, 729 S.W.2d 825, 878 (Tex. App.—Houston [14th Dist.] 1987, no writ). A cause of action does not become groundless,

7

however, simply because a plaintiff failed to convince a jury of the truth of her allegations. *Rutherford v. Riatta Cadillac Co.*, 809 S.W.2d 535, 538 (Tex. App.—San Antonio 1991, writ denied); *D.W. Knebel v. Port Enters., Inc.*, 760 S.W.2d 829, 832 (Tex. App.—Corpus Christi 1988, writ denied).

A finding that a case is groundless is necessary in order for a court to find that the suit was brought solely for the purposes of harassment. *Donwerth*, 775 S.W.2d at 638. In determining bad faith, the trial court must find that the suit was motivated by a malicious or discriminatory purpose or a reckless disregard for the defendant's rights. *Schlager v. Clements*, 939 S.W.2d 183, 190 (Tex. App.—Houston [14th Dist.] 1996, writ denied); *Elbaor v. Sanderson*, 817 S.W.2d 826, 829 (Tex. App.—Fort Worth 1991, no writ); *Knebel*, 760 S.W.2d at 832.

The district court's judgment specifically found that Gasparotto's claims were "groundless in fact or law or [were] brought in bad faith or for the purposes of harassment." Evidence in the record supports the conclusion that this finding was within the proper scope of the district court's discretion. Gasparotto's case relied upon representations that she alleged were made by Gallagher in conversations between her and Wilkes. Specifically, Gasparotto testified at trial that Wilkes "sold" her on the idea of using electric fencing for the Lohn ranch and made representations that the fence would be safe and would contain the goats. Furthermore, Gasparotto testified that Wilkes made an unsolicited phone call and convinced her that electric fencing would work "wonderfully" for the breeding pens at the Lohn ranch. She testified that she would not have installed electric fence at the Lohn ranch if Wilkes had not represented to her its safety and effectiveness.

Wilkes's testimony completely contradicted that of Gasparotto. He testified that Gasparotto had already decided to use electric fence for the pastures at the Lohn ranch when he met with her to take an order for the materials. He also testified that he did not even know electric fence was to be used in the breeding pens until he visited the Lohn ranch and saw them being installed. Wilkes testified that he would not have recommended using electric fence in the breeding pens. A fact finder may resolve inconsistencies in testimony and judge credibility in determining whether a suit is groundless. *See Fichner v. Richardson*, 708 S.W.2d 479, 483 (Tex. App.—Dallas 1986, writ ref'd). The district court was entitled to believe Wilkes's testimony that Gasparotto already intended to use electric fencing and that there were no misrepresentations made to Gasparotto. We are unable to conclude that the district court's finding that Gasparotto's suit was groundless was an abuse of discretion.

Gasparotto's inconsistent testimony further supports the district court's finding of groundlessness or bad faith. She testified all four goats that died in the fence at the Lohn ranch were tangled or leaning into the fence. Her own witness testified differently: eyewitness Bratton testified that one of the goats fell away from the fence.[2] More importantly, Gasparotto was inconsistent even in the number of goats that were killed. She testified at trial that four goats were killed by the fence. In correspondence submitted to Gallagher within a month of the death of the goats, however, she only referenced three goats. In addition, other correspondence with Gallagher claimed reimbursement for costs to replace the fence that exceeded the actual amount expended for the job. Based upon

---

[2] There were other inconsistencies regarding the death of goats. Gasparotto testified that she removed a goat from the electric fence at her Buda ranch. She was contradicted by the testimony of David Goll who stated he removed the goat.

9

Gasparotto's inconsistent testimony alone, we cannot say that the district court acted arbitrarily, unreasonably, or without reference to any guiding rules or principles in finding Gasparotto's claims groundless, made in bad faith, or made for the purposes of harassment. *See Elboar*, 817 S.W.2d at 830 (no abuse of discretion in finding claim groundless or in bad faith based on inconsistent testimony).

Gasparotto also contends that the district court erred in awarding attorney's fees to Gallagher as a prevailing party under section 38.001 of the Texas Civil Practice and Remedies Code. To recover attorney's fees under this section, a party must (1) prevail on a cause of action for which attorney's fees are recoverable and (2) recover damages. *Green Int'l, Inc. v. Solis*, 951 S.W.2d 384, 390 (Tex. 1997). Although Gasparotto may have been entitled to attorney's fees under section 38.001 as the plaintiff, the statute does not entitle a party who successfully defends against a contractual lawsuit to recover attorney's fees. *See Ventana Inv. v. 909 Corp.*, 879 F. Supp. 676, 678 (E. D. Tex. 1995), *vacated on other grounds*, 65 F.3d 422 (5th Cir. 1995). Even if we were to accept Gallagher's contention that its defenses to Gasparotto's suit amounted to a separate claim, it recovered no damages from the suit other than attorney's fees and would still not be entitled to attorney's fees under the statute. *See Green Int'l, Inc.*, 951 S.W.2d at 390. Because we find the district court did not abuse its discretion in awarding Gallagher attorney's fees pursuant to its DTPA counterclaim, however, we overrule Gasparotto's first issue.

**Expert Testimony**

Gasparotto contends in her second issue that the district court erred in admitting the testimony of goat expert Dr. Phillip Sponenberg regarding electric fencing. Specifically, she asserts

that the district court erred in failing to hold a gatekeeping hearing on the reliability of the expert testimony and that Dr. Sponenberg was not qualified to give an opinion on the subjects about which he testified. We review a trial court's decision to admit expert testimony under an abuse of discretion standard. *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999); *E. I. du Pont de Nemours & Co. v. Robinson*, 923 S.W.2d 549, 558 (Tex. 1995).

Gasparotto first contends that Sponenberg's testimony was improperly admitted because the district court did not perform its gatekeeping function by holding a pretrial hearing on the reliability of the expert testimony. *See Robinson*, 923 S.W.2d at 556 (trial court is responsible for making preliminary determination as to admissibility of expert testimony). Gasparotto correctly states in her brief that an appellate court must have a sufficiently developed record in order to allow a determination of whether the district court correctly admitted expert testimony. *See Tanner v. Wesbrook*, 174 F.3d 542, 546 (5th Cir. 1999); *United States v. Nichols*, 169 F.3d 1255, 1262 (10th Cir. 1999). The record shows that a gatekeeping hearing was held on the admissibility of Sponenberg's testimony, but that the hearing was not transcribed in the record submitted by Gasparotto on appeal. The party appealing a trial court's judgment bears the burden of requesting the reporter's record. When the record requested by the appellant does not contain relevant proceedings, we are authorized to decline to resolve the dispute or to presume that the material favors the appellee. *See Bryant v. United Shortline, Inc. Assurance Servs., N.A.*, 972 S.W.2d 26, 31 (Tex. 1998); *In re Spiegel*, 6 S.W.3d 643, 646 (Tex. App.—Amarillo 1999, no pet.) (rule in *Bryant* not abrogated by amendments to rules of appellate procedure). Gasparotto's failure to secure a transcript of the gatekeeping hearing warrants a greater degree of deference to the district court, not a reduced one.

11

The record before us, however, is sufficient to determine whether the district court abused its discretion in admitting Sponenberg's testimony. The requirements for admitting expert testimony are that the expert must be qualified, and that the expert's opinion must be relevant to the issues in the case and based upon a reliable foundation. Tex. R. Evid. 702; *Exxon Pipeline Co. v. Zwahr*, 88 S.W.3d 623, 628-29 (Tex. 2002); *Robinson*, 923 S.W.2d at 556. Expert testimony must generally involve scientific, technical, or other specialized knowledge as to which a witness could be qualified by knowledge, skill experience, training, or education. *See GTE Southwest, Inc. v. Bruce*, 998 S.W.2d 605, 620 (Tex. 1999).

Here, the testimony was composed of opinion based on both scientific evidence as well as the doctor's own experience. Sponenberg is a professor of veterinary medicine specializing in pathology and the care of goats and sheep. He has over ten years of experience raising myotonic goats on his own ranch. Gallagher presented Sponenberg's testimony on limited issues. He testified as to his own qualifications and experience with myotonic goats. He discussed ways in which goats, including myotonic goats, commonly get caught in fences and die. He then explained that it would be extremely unlikely for a shock from an electric fence alone to kill a goat by stopping its heart because of the cycles of the heart and the way an electric current would travel through the goat. Sponenberg named ranchers he knew in Texas who used electric fences in raising myotonic goats. Finally, Sponenberg explained that goats need to be trained to avoid electric fences and that a change in the configuration of fences would require a rancher to retrain the goats. Sponenberg's testimony had a reasonable basis in his knowledge as a veterinary pathologist and experience as a myotonic goat rancher. *See Kumho*, 526 U.S. at 149 (expert testimony must have reasonable basis in expert's

12

specialized knowledge and experience). Sponenberg's testimony did not contain the sort of "junk science" and rank speculation discussed in *Robinson*. 923 S.W.2d at 553-54. Based on our review of Sponenberg's trial testimony and our presumption that the un-transcribed gatekeeping hearing favors admission of the testimony, we find that the district court did not abuse its discretion in admitting Sponenberg's testimony. We overrule Gasparotto's second issue.

## CONCLUSION

We hold that the district court did not abuse its discretion in awarding attorney's fees to Gallagher or in admitting the expert testimony of Dr. Sponenberg. We therefore affirm the district court's judgment.

_____

Jan P. Patterson, Justice

Before Chief Justice Law, Justices B. A. Smith and Patterson

Affirmed

Filed: January 23, 2004

13