# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## ON MOTION FOR REHEARING

## NO. 03-09-00056-CV

**Appellant, Attila B. Horvath// Cross-Appellant, Julie Ann Hagey**

**v.**

**Appellee, Julie Ann Hagey// Cross-Appellee, Attila B. Horvath**

### FROM THE DISTRICT COURT OF TRAVIS COUNTY, 200TH JUDICIAL DISTRICT NO. D-1-FM-01-000225, HONORABLE ORLINDA NARANJO, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

The memorandum opinion issued by this court on March 25, 2011, is withdrawn and the following memorandum opinion is substituted in its place. We overrule the parties' motions for rehearing.

Attila B. Horvath appeals the trial court's post-divorce order distributing proceeds from the sale of the parties' property and awarding attorney's and bookkeeping fees to his former wife, Julie Ann Hagey. In two issues, Horvath contends that the trial court erred by misconstruing the terms of the parties' agreements regarding the disposition of certain marital assets and by awarding Hagey attorney's fees and bookkeeping expenses. Hagey raises one issue on cross-appeal, contending that the trial court erred by denying her motion to submit additional evidence of her

appellate attorney's fees. We will reverse and render in part, modify in part, and affirm the judgment as modified.

## BACKGROUND

Horvath and Hagey married in 1989 and divorced in 2001. In dividing their community property in anticipation of their divorce, the parties agreed to award their shares of stock in a Hungarian power plant to Horvath.[1] Because Horvath had used $185,000 of Hagey's separate property to purchase these shares of stock, they also included in their decree a payment plan to reimburse Hagey for her separate property. The payment plan required Horvath to pay Hagey the first $185,000 of any proceeds he received from dividends or sale of his interest in the Hungarian power plant, keep the second $185,000 of proceeds for himself, and then split any remaining proceeds evenly with Hagey. Pursuant to this payment plan, Horvath paid Hagey $179,648.01 in dividend distributions from the stock.

In 2006, during discovery in a suit to modify the parent-child relationship, Hagey learned for the first time that Horvath had used her $185,000 of separate property to purchase shares of stock in two Hungarian power plants—known as the Dunamenti and the Vertesi power plants—not just the one unidentified Hungarian power plant described in their divorce decree. To correct this discrepancy—i.e., that the community owned shares in two Hungarian power plants, but

_____

[1] When the parties separated in May 2000, they entered into a separation agreement setting forth how their property would be distributed if the parties divorced. This separation agreement includes the provisions dividing the parties' interest in the Hungarian power plant, but because it was eventually incorporated in the decree, we will refer to the decree when discussing any terms included in this separation agreement.

their decree only disposed of the shares of one power plant—the parties agreed to "clarify" their divorce decree by acknowledging that they owned shares in two Hungarian power plants and by modifying the division of property such that each party owned 50% of the shares in both Hungarian power plants. Their agreement also specifically retained the payment plan from the divorce decree.[2] The parties incorporated this agreement into their agreed order modifying the parent-child relationship (the "2006 agreed order").

In 2007, Hagey and Horvath agreed to sell their individually owned shares of stock in the Vertesi power plant to a third party for a combined amount of $280,281.88. Because they disagreed on how these proceeds should be distributed under the decree and the 2006 agreed order, however, they deposited the sale proceeds into escrow with Hagey's attorney until the matter could be resolved. Hagey eventually initiated this proceeding, claiming that she was entitled to one-half of the Vertesi sale proceeds—i.e., $140,140.94—under the terms of the parties' 2006 agreed order. She also requested her attorney's fees incurred in connection with the distribution issue and bookkeeping expenses related to a child-support dispute. Horvath responded by asserting that, before the Vertesi proceeds could be split under the 2006 agreed order, he was entitled to his $185,000 payment under the divorce decree's payment plan because Hagey had already received the bulk of her $185,000 payment—i.e., $179,648.01—under that same payment plan.

After a bench trial, the trial court found that the divorce decree applied only to the Dunamenti interest; thus, the proceeds from the Vertesi stock sale were not subject to the divorce decree's payment plan. Based on this finding, the trial court awarded Hagey $140,140.94 as her one-

---

[2] Based on stipulations at trial, the $179,648.01 Horvath paid Hagey under this payment plan came from dividend distributions from the Dunamenti power plant.

half share of the Vertesi stock sale proceeds under the terms of the 2006 agreed order, $54,830 in attorney's fees, and $2,000 for bookkeeping expenses.[3] Horvath appeals this judgment.

## DISCUSSION

### *Hungarian Power Plants*

Horvath argues in his first issue that the trial court incorrectly interpreted the parties' agreements regarding the disposition of the Hungarian power-plant stock and, as a result, incorrectly divided the Vertesi sale proceeds. Specifically, he argues that, pursuant to the decree as modified by the 2006 agreed order, the $280,281.88 in Vertesi sale proceeds should be distributed as follows: (1) $5,351.99 to Hagey as the amount remaining of her $185,000 payment under the decree's payment plan; (2) $185,000 to Horvath as his payment under the payment plan; and (3) $44,964.95 each to Hagey and Horvath, as an equal division of the remaining funds. In contrast, Hagey argues that the divorce decree's payment plan applies only to Dunamenti stock dividends and, as a result, she is entitled to one-half of the Vertesi proceeds—i.e., $140,140.94—reflecting her one-half ownership interest in that stock as memorialized in the 2006 agreed order. Both parties assert that the terms of the divorce decree and the 2006 agreed order relating to the power-plant stock are unambiguous and support their interpretation.

To determine how the Vertesi stock proceeds should be distributed under the terms of the parties' divorce decree and 2006 agreed order, we must interpret those agreements. We

---

[3] The trial court also awarded Hagey $15,171.44 as reimbursement for an outside loan given by Horvath from that ownership interest, but we do not review that award here because neither party challenges it on appeal.

4

interpret property settlement agreements incorporated into divorce decrees according to the law of contracts. *Buys v. Buys*, 924 S.W.2d 369, 372 (Tex. 1986). If the language is unambiguous, we interpret an agreed divorce decree and an agreed order modifying that decree just like any other judgment, "reading the decree as a whole and 'effectuat[ing] the order in light of the literal language used." *See Reiss v. Reiss*, 118 S.W.3d 439, 441 (Tex. 2003) (quoting *Wilde v. Murchie*, 949 S.W.2d 331, 332 (Tex. 1997)). If the language is ambiguous, we must review the record along with the decree in interpreting the judgment. *Shanks v. Treadway*, 110 S.W.3d 444, 447 (Tex. 2003).

Whether a document is ambiguous is a question of law that we review de novo. *Id.* We determine whether a contract is ambiguous by looking at the agreement as a whole in light of the circumstances surrounding its formation. *Coker v. Coker*, 650 S.W.2d 391, 394 (Tex. 1983). Merely because the parties argue different interpretations does not make an agreement ambiguous. *Forbau v. Aetna Life Ins. Co.*, 876 S.W.2d 132, 134 (Tex. 1994). If the agreement is worded so that we can give it a certain or definite legal meaning, it is not ambiguous and we construe it as a matter of law. *Coker*, 650 S.W.2d at 393.

The divorce decree addresses the disposition of the parties' interest in the Hungarian power plant as follows:

Husband owns an interest in an electrical power plant in Hungary. Husband acquired his interest in the electrical power plant in Hungary with an initial investment of $185,000. The source of funds for this $185,000 initial investment in the Hungary power plant was Wife's separate property. At the present time, the Hungarian electrical power plant interest is not liquid. Subject to Husband's obligation to pay to Wife the payments set forth below, Wife shall convey and release to Husband any and all interest, marital or otherwise, which she may have in the electrical power plant investment. Husband agrees to pay to Wife the first $185,000 of monies that he receives in profit distributions and/or liquidation of his interest in the electrical power plant to Wife and he shall pay her as he receives the monies. Husband shall

5

then be entitled to receive the next $185,000 of profits and/or monies received in liquidation of his interest in the electrical power plant. Thereafter, any monies received by way of profit distributions and/or monies from the sale of the electrical power plant interest shall be divided fifty percent (50%) to Husband and fifty percent (50%) to Wife.

This provision refers to and divides the parties' interest in "an electrical power plant in Hungary," but the parties owned interests in two electrical power plants in Hungary—the Dunamenti and the Vertesi plants. Thus, this provision could be referring to either the Dunamenti or the Vertesi plant. Accordingly, the decree contains a latent ambiguity. *See Friendswood Dev. Co. v. McDade & Co.*, 926 S.W.2d 280, 282-83 (Tex. 1996) (holding that "a latent ambiguity exists when a contract is unambiguous on its face, but fails by reason of some collateral matter when it is applied to the subject matter with which it deals"); *see also Raffles v. Wichelhaus*, (1864) 159 Eng. Rep. 375 (Exch.) (classic "Peerless" case). When a decree is ambiguous, the court must construe it to give effect to the parties' true intent as expressed in the written instrument. *Forbau*, 879 S.W.2d at 133. The parties' intent is a question of fact. *Coker*, 650 S.W.2d at 393-94.

The trial court here concluded that the parties' divorce decree applied only to the Dunamenti power plant. Although the parties do not challenge this conclusion on appeal, it is supported by the following unchallenged findings of fact: the divorce decree referred to only one power plant, Hagey was not aware that the parties owned investments in two power plants prior to the divorce, Hagey did not learn of the existence of the parties' ownership interest in the Vertesi plant until after the parties' divorce, Hagey received dividends from the Dunamenti stock, and Hagey received no money from the Vertesi stock. Further, to the extent it is necessary, we can presume any omitted findings favorable to the judgment because (1) an element of the ground of recovery was

6

included in the findings of fact; (2) the omitted element has not been properly requested; and (3) the omitted finding is supported by the evidence. *See* Tex.R.Civ.P. 299; *American Nat'l Ins. Co. v. Paul*, 927 S.W.2d 239, 245 (Tex. App.—Austin 1996, writ denied). Accordingly, based on the trial court's findings of fact and conclusion of law, the decree awarded Horvath all of the Dunamenti shares and established a payment plan stipulating how Horvath must divide any proceeds he received from his interest between the parties.

We next address the 2006 agreed order, which addresses the Hungarian power plants as follows:

> The Court further finds that the parties have acknowledged to the Court that the need exists for clarification of certain provisions of the [divorce decree], that they have reached an agreement and ask the Court to enter this Order clarifying their ownership rights and duties as they relate to certain foreign assets located in Hungary. The Court hereby approves the parties' agreement and ORDERS as follows:
>
> 1.    The parties' ownership interest in two Hungarian power plants, known as the Dunamenti and Vertesi Plants, is hereby PARTITIONED such that [Hagey] owns a 50% divided interest and [Horvath] owns a 50% divided interest in the shares of stock previously issued to the parties . . . .
>
> . . . .
>
> All provisions of the parties' [divorce decree] that pertain to the schedule of payment of dividends to each party shall remain in full force and effect, and are not modified by this Order, including, but not limited to, the schedule for dividing the dividends and other payments.

We agree with the parties that this provision is unambiguous. It clarifies the decree's ambiguity by explaining that the parties own shares in two Hungarian power plants. It then *modifies* the decree's division of property by awarding each party one-half of the Dunamenti and Vertesi shares. Finally, it stipulates that the decree's payment plan remains in effect as written. Thus, the 2006 agreed order

7

(1) redefines the parties' interest from shares in one unidentified Hungarian power plant to shares in the Vertesi and Dunamenti power plants, (2) awards each party one-half of that interest, and (3) provides that the divorce decree's payment plan regarding that newly modified interest remain in effect as written. Accordingly, the trial court erred in its judgment that the decree as modified by the 2006 agreed order applied only to the Dunamenti stock and, as a result, in its division of the Vertesi sale proceeds.

Hagey argues that the 2006 agreed order awards her a one-half interest in both power plants, but that the payment plan in the original decree only applies to the Dunamenti interest. Under this interpretation, the 2006 agreed order clarifies the decree's ambiguous reference to the parties' power-plant interest by specifying how the interest is to be divided, but does not clarify from which power-plant interest the $185,000 payments are to be made. This is not a reasonable interpretation because it suggests that the parties limited their clarification of an ambiguity to only one effect of the ambiguity, rather than resolving the same ambiguity throughout the same provision of the original decree.

Horvath, on the other hand, contends that both the decree and the 2006 agreed order apply in determining the correct division of the Vertesi sale proceeds. He asserts that: first, those funds must be used to satisfy the remaining payments due under the decree's payment plan—i.e., $5351.99 to Hagey and $185,000 to him—then the parties divide the remaining $89,929.89 of the Vertesi proceeds equally under the terms of the 2006 agreed order. Horvath's interpretation is substantially correct, but it ignores the language in the decree specifying that the $185,000 payments must be paid from *Horvath's* interest. Horvath's construction only works if the $185,000 payments come from *both* his and Hagey's interests in the proceeds. But the divorce decree's payment plan

is written in terms of Horvath's duty to make the payments from Horvath's interest: it requires Horvath to pay the $185,000 payments from the proceeds "he receives" from "his interest" in the power plant ownership. By expressly retaining the payment schedule from the original division of property, the parties agreed that Horvath's payments to Hagey must be made solely from Horvath's interest in the Hungarian power plants. After the 2006 agreed order, Horvath's interest is one-half of the Vertesi shares and one-half of the Dunamenti shares.

Construing these two agreements, we hold as follows. Under the terms of the original decree and based on the trial court's finding that the decree applied to the Dunamenti power plant, Horvath owned 100% of the Dunamenti shares. Thus, although subject to the decree's payment plan, Horvath owned all "monies that he receive[d] in profit distributions and/or liquidation of his interest" prior to the 2006 agreed order. As a result, all payments made pursuant to that payment plan prior to the 2006 agreed order are credited to reduce Horvath's obligation under the payment plan. As a result of the 2006 agreed order, Horvath and Hagey each owned 50% of the shares of stock in each power plant after that order was rendered. Thus, they each owned half of any proceeds generated from those shares of stock by dividend, liquidation, or otherwise, after the 2006 agreed order. Horvath's half of those proceeds, however, remained subject to the decree's payment plan. Consequently, to the extent that he had not previously satisfied the $185,000 payments under the terms of the payment plan prior to that time, Horvath must make those payments from *his* one-half of the Vertesi sale proceeds.

Having construed these two agreements, we must now enforce those agreements as written to determine the correct disposition of the Vertesi proceeds at issue here. *See Hagen v. Hagen*, 282 S.W.3d 899, 902 (Tex. 2009); *Shanks*, 110 S.W.3d at 449. At trial, the parties

9

stipulated that (1) during the period between 2001 and June 2008, the Dunamenti power plant declared dividends in the years 2000, 2001, 2002, 2004, 2005, and 2006; (2) the Vertesi power plant declared no dividends during any time the parties owned shares of stock in that plant, (3) Horvath paid Hagey $179,648.01 from Dunamenti dividends between 2000 and June 2008, and (4) the Vertesi stock sold for $280,281.88 on December 11, 2007.

Because the Vertesi sale took place after the 2006 agreed order, Horvath and Hagey each own half of the proceeds from that sale—i.e., $140,140.94. Horvath's half of these sale proceeds is subject to the decree's payment plan; thus, Horvath must pay from his half of the proceeds the remaining balance from the $185,000 obligation to Hagey under the payment plan, which is $5,351.99 based on the parties' stipulation that Hagey already received $179,648.01 of the Dunamenti dividends. Therefore, we hold that under the terms of the parties' agreements Hagey is entitled to $140,140.94 of the Vertesi proceeds as her one-half share, plus $5,351.99 from Horvath's share of the Vertesi proceeds as her final payment under the payment plan, for a total of $145,492.93. Horvath is entitled, under the terms of the parties' agreement, to the remaining $134,788.95.

***Attorney's Fees and Expenses***

In his second issue, Horvath challenges the trial court's award of attorney's fees and bookkeeping expenses to Hagey. Specifically, Horvath argues that (1) the attorney's fees were not properly segregated, (2) Hagey was not entitled to all her attorney's fees because she was not successful on all her claims, (3) the evidence was legally and factually insufficient to support the reasonableness of the amount of attorney's fees awarded, and (4) there was no legal basis for an award of bookkeeping expenses.

10

We review a trial court's decision to grant or deny attorney's fees under an abuse of discretion standard. *Bocquet v. Herring*, 972 S.W.2d 19, 21 (Tex. 1998). A trial court abuses its discretion if it acts without reference to any guiding rules and principles. *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241-42 (Tex. 1985). To determine whether a trial court abused its discretion, we must determine whether its action was arbitrary or unreasonable. *Id*. at 242.

Whether attorney's fees are reasonable is a question of fact determined by the fact-finder, which determination we review for factual and legal sufficiency of the evidence. *Bocquet*, 972 S.W.2d at 21. For a legal sufficiency challenge, we review the evidence in the light most favorable to the judgment, crediting favorable evidence if a reasonable fact finder could, and disregarding contrary evidence unless a reasonable fact finder could not. *City of Keller v. Wilson*, 168 S.W.3d 802, 807 (Tex. 2005). We will sustain a legal sufficiency complaint if the record reveals (1) a complete absence of evidence of a vital fact, (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact, (3) the evidence offered to prove a vital fact is no more than a mere scintilla, or (4) the evidence establishes conclusively the opposite of a vital fact. *Id*. at 810. In reviewing factual sufficiency of the evidence, we must consider and weigh all the evidence and should set aside the judgment only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986).

Horvath asserts that the trial court erred in awarding attorney's fees to Hagey because she failed to segregate her fees between claims for which she was entitled to recover attorney's fees and those for which she was not. *See Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299, 313 (Tex. 2006) (holding that "if any attorney's fees relate solely to a claim for which such fees are

11

unrecoverable, a claimant must segregate recoverable from unrecoverable fees"). Hagey argues that Horvath waived his segregation argument because he did not timely dispute Hagey's failure to segregate attorney's fees. We agree. "[I]f no one objects to the fact that the attorney's fees are not segregated as to specific claims, then the objection is waived." *Green Int'l, Inc. v. Solis*, 951 S.W.2d 384, 389 (Tex. 1997). In a bench trial, such as was held here, the segregation issue must be raised at trial. *Chambers v. Ochiltree*, No. 03-04-00143-CV, 2004 WL 2814288, at *5 (Tex. App.—Austin Dec. 9, 2004, no pet.) (citing *Solis*, 951 S.W.2d at 389). Here, Horvath raised the segregation issue for the first time in a motion for new trial filed after the court had issued its ruling. Accordingly, Horvath's segregation objection was untimely and, thus, any error is waived. *See Red Rock Props. 2005 Ltd. v. Chase Home Fin., L.L.C.*, No. 14-08-00352-CV, 2009 WL 1795037, at *6-7 (Tex. App.—Houston [14th Dist.] June 25, 2009, no pet.) (mem. op.) (holding that raising segregation issue for first time in motion for new trial was untimely and therefore waived).

We next address Horvath's contention that the trial court erred in awarding attorney's fees because Hagey was not successful on all her claims. To the extent that this is a complaint regarding Hagey's failure to segregate her fees, Horvath waived this issue for the reasons discussed above. To the extent that this complaint addresses the trial court's authority to award these attorney's fees, however, we will address this issue.

Not all statutes or contracts authorizing the award of attorney's fees limit recovery of those fees to the prevailing party in the suit. *See, e.g.*, Tex. Civ. Prac. & Rem. Code Ann. § 37.009 (West 2008) (authorizing award of "reasonable and necessary attorney's fees as are equitable and just" in declaratory judgment action). Here, however, the parties' divorce decree

provides for an award of attorney's fees incurred in connection with the decree's division of property:

> In the event it becomes necessary to institute legal action to enforce compliance with the terms of this Agreement or by reason of the breach by either party of this Agreement, then the parties agree that at the conclusion of such legal proceeding, the losing party shall be solely responsible for all legal fees and cost incurred by the other party, such fees and cost to be taxed by the court. The amount so awarded shall be in the sole discretion of the presiding judge and the award shall be made without regard to the financial ability of either party to pay, but rather shall be based upon the fees and expenses determined by the court to be reasonable and incurred by the *prevailing party*.

(Emphasis added.) A "prevailing party" is a party who "successfully prosecutes the action or successfully defends against it, prevailing on the main issue, even if not to the extent of her original contention." *Robbins v. Capozzi*, 100 S.W.3d 18, 27 (Tex. App.—Tyler 2003, no pet.); *see Dear v. City of Irving*, 902 S.W.2d 731, 739 (Tex. App.—Austin 1995, writ denied).

The main objective of Hagey's suit here was to obtain a favorable distribution of the Vertesi sale proceeds. Specifically, Hagey asked the trial court to find that (1) she was entitled $140,140.94 of the Vertesi proceeds as her one-half ownership of that property interest, (2) she was entitled to an additional $5,351.91 from the Vertesi sale proceeds as the unpaid amount under the decree's payment plan, and (3) Horvath was solely responsible for a loan debt related to the power plant interest. She also asked the trial court to enforce the decree's medical support provisions, which issue the parties settled prior to trial, and to find Horvath in contempt for discovery violations. In contrast, Horvath asked the trial court to distribute $229,964.98 of the Vertesi sale proceeds to him and $50,316.89 to Hagey. Horvath also asked the trial court to disregard a loan Horvath made in connection with the power plant shares of stock.

13

The trial court found that Hagey was not entitled to the $5,351.91 dividend payment, but found that she was entitled to $140,140.94 as her one-half ownership of the Vertesi stock and to $15,171.44 as repayment for the loan associated with the power plant stock, for a total award of $155,312.38 from the Vertesi stock sale. Based on the relief requested and the trial court's division, we cannot say that the trial court abused its discretion in determining that Hagey was the prevailing party. Accordingly, it was not error for the trial court to award Hagey attorney's fees.[4]

We next address Horvath's contention that the trial court's award of attorney's fees and expenses was not reasonable. When determining an award's reasonableness, the fact-finder should consider the following factors: (1) the time and labor required, the novelty and difficulty of the questions involved, and the skill required to perform the legal service properly; (2) the likelihood that the acceptance of the particular employment will preclude other employment by the lawyer; (3) the fee customarily charged in the locality for similar legal services; (4) the amount involved and the results obtained; (5) the time limitations imposed by the client or by the circumstances; (6) the nature and length of the professional relationship with the client; (7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and (8) whether the fee is fixed or contingent on results obtained or uncertainty of collection before the legal services have been rendered. *See Arthur Andersen & Co. v. Perry Equip. Corp.*, 945 S.W.2d 812, 818 (Tex. 1997).

Here, the trial court awarded Hagey $56,830 for attorney's fees and expenses based on its findings of fact that Hagey had incurred $6,000 for representation by Hungarian attorney

---

[4] Further, our opinion giving effect to the literal language of the decree as modified has resulted in a division that is greater than the trial court's division. *See Shanks v. Treadway*, 110 S.W.3d 444, 449 (Tex. 2003) (holding that appellate court must enforce decree as written).

14

Karancsi Erika, $48,830 in attorney's fees for legal representation by Scott R. Kidd, and $2,000 for bookkeeping expenses. To support of her request for these fees, Hagey testified as follows:

> Q: Have you paid Karancsi Erika any money?
>
> A: Yes, I have.
>
> Q: And how much have you paid her?
>
> A: $6,000 to date.
>
> . . . .
>
> Q: Now when you—when I first started representing you, I was at Brown McCarroll, correct?
>
> A: Correct.
>
> Q: And you've paid Brown McCarroll some $6,300, correct?
>
> A: Correct.
>
> Q: Did you hire anybody else?
>
> A: Scott Kidd.
>
> Q: Okay. And—
>
> A: Karancsi Erika.
>
> Q: Karancsi Erika. With regard to—and for getting—we received some money today with regard to medical reimbursement, right?
>
> A: Yes.
>
> Q: And have you over the—in order to keep track of all that, for four kids, used a bookkeeper to keep—
>
> A: Yes, I did.
>
> Q: And submit statements to Mr. Horvath monthly?

A:    Absolutely.

Q:    What have you paid your bookkeeper to keep track of that stuff?

A:    $2,000.  $25 an hour is her charge, and it has been detailed.

Hagey's attorney, Scott R. Kidd, also testified in support of Hagey's request for attorney's fees. Specifically, Kidd testified that he had been licensed in Texas since 1972 and had been board certified in civil trial and personal injury law for approximately twenty years.  Regarding his fees, Kidd testified as follows:

> I was hired by Ms. Hagey in December of '07, and I have—while I was still at Brown McCarroll.  While at Brown McCarroll, the hourly rate which I am charging her and which I believe is a reasonable rate for the work in Travis County is $375 an hour.  I charge—I was charging her that rate at Brown McCarroll and am now.

> The fees that I charged at Brown McCarroll were $6,228, I believe.  And since I have left Brown McCarroll, I have billed her, through the end of last month, which was paid, the sum of $22,627.  Through yesterday, considering the amount of time that I've put into it this month at that hourly rate, there is $19,975 of additional time that has been incurred.

Horvath's attorney did not cross-examine Hagey or Kidd about the reasonableness of the fees.

Regarding the trial court's award of the attorney's fees for Kidd's representation, Kidd testified about his qualifications and experience as an attorney, his hourly rate, which he testified was reasonable, and about the total fees Hagey incurred from his representation.  Although this testimony did not address each of the *Arthur Andersen* factors, a trial court is not required to receive evidence on each of these factors.  *See Arthur J. Gallagher & Co. v. Dietrich*, 270 S.W.3d 695, 706 (Tex. App.—Dallas 2008, no pet.).  A trial court can look at the entire record, the evidence

16

presented on reasonableness, the amount in controversy, the common knowledge of the participants as lawyers and judges, and the relative success of the parties. *In re A.B.P.*, 291 S.W.3d 91, 98 (Tex. App.—Dallas 2009, no pet.). Thus, for example, the trial court here could have divided the total amount of Hagey's attorney's fees by her attorney's hourly rate to arrive at the total number of hours spent on this matter. Also, having granted judgment in this matter after a full trial on the merits, the trial court was aware of the dispute and the relative success of the parties. Finally, Horvath did not contradict Hagey and Kidd's testimony regarding attorney's fees. *See Ragsdale v. Progressive Voters League*, 801 S.W.2d 880, 882 (Tex. 1990). "Testimony from a party's attorney about a party's attorney's fees is taken as true as a matter of law if the testimony 'is not contradicted by any other witness and is clear, positive, direct, and free from contradiction.'" *In re A.B.P.*, 291 S.W.3d at 98 (citation omitted). "This is especially true where the opposing party had the means and opportunity to disprove the testimony, but failed to do so." *Id.* For all these reasons, we conclude that the evidence is legally and factually sufficient to support the award of $48,830 as attorney's fees for Kidd's representation of Hagey.

In contrast, the only evidence supporting the trial court's award of $6,000 as attorney's fees for Karancsi Erika's representation was Hagey's lay testimony that she paid Erika $6,000. Expert testimony is required to support an award of attorney's fees. *Woollet v. Matyastik*, 23 S.W.3d 48, 52 (Tex. App.—Austin 2000, pet. denied). Further, there was no evidence of any *Arthur Andersen* factors and without evidence of at least some of these factors, there is no meaningful way for the fact finder to determine if the fees are in fact reasonable and necessary. *Arthur Andersen*, 945 S.W.2d at 819. Accordingly, the evidence was legally insufficient to support

the trial court's award of $6,000 as attorney's fees for Karancsi Erika's representation. *See Bocquet*, 972 S.W.2d at 21.

Finally, Horvath contends that trial court erred in awarding $2,000 to Hagey for bookkeeping because it had no authority to award these expenses and because the evidence was legally and factually insufficient to support the award's reasonableness. Hagey asked for these bookkeeping expenses in connection with her request to enforce the decree's medical support provisions for the parties' children. Thus, assuming without deciding that the trial court was authorized to award these expenses as "reasonable attorney's fees and expenses" under the family code, Hagey was required to offer evidence that the amount was reasonable. *See* Tex. Fam. Code Ann. § 106.002 (West 2009). But the only evidence supporting this award was Hagey's testimony that she paid a bookkeeper $2,000 to "keep track of" medical reimbursement "stuff." Neither Hagey nor Kidd testified that these expenses were reasonable, nor did Hagey offer any additional evidence about the expenses that would allow the trial court to determine that they were reasonable. Accordingly, Hagey did not provide legally sufficient evidence of the reasonableness of her bookkeeping expenses.

### Hagey's Cross-Appeal

In a single issue, Hagey argues that it was error for the trial court to deny her motion to reopen the evidence to submit her appellate attorney's fees evidence. *See* Tex. R. Civ. P. 270 ("When it clearly appears to be necessary to the due administration of justice, the court may permit additional evidence to be offered at any time . . . ."). The record indicates that the trial court did not rule on Hagey's motion, which Hagey filed seven days after Horvath filed his notice of appeal in this

case. Generally, when an appeal is perfected to a court of appeals, that court "acquires plenary exclusive jurisdiction over the entire controversy." *Ammex Warehouse Co. v. Archer*, 381 S.W.2d 478, 482 (Tex. 1964) (citations omitted). Thus, the trial court lacked jurisdiction to grant Hagey's motion to reopen the evidence and, accordingly, did not err when it failed to rule on Hagey's motion. We overrule Hagey's issue.

## CONCLUSION

We reverse the trial court's division of the Vertesi proceeds and render judgment that under the terms of the parties' agreements Hagey is entitled to $145,492.93 of the proceeds and Horvath is entitled to $134,788.95 of the proceeds. We reverse the trial court's award of bookkeeping expenses and render judgment that Hagey take nothing on that claim. Finally, we modify the trial court's judgment for attorney's fees to award Hagey $48,830 in attorney's fees. As modified, we affirm the remainder of the judgment.[5]

_____

David Puryear, Justice

Before Justices Puryear, Pemberton and Henson

Modified and, as Modified, Affirmed in part; Reversed and Rendered in part

Filed: May 6, 2011

_____

[5] In her motion for rehearing, Hagey suggests that our opinion fails to account for the $15,171.44 award that we did not review here because it was not challenged by either party. We simply note that, as modified, we have affirmed the remainder of the trial court's judgment.

19